**The PEOPLE of the State of Colorado, Petitioner,**

v.

**Tristan TOLER, Respondent.**

No. 98SC858.

Supreme Court of Colorado, En Banc.

Sept. 11, 2000.

Ken Salazar, Attorney General, John J. Fuerst III, Assistant Attorney General, Appellate Division, Denver, Colorado, Attorneys for Petitioner.

David Kaplan, Colorado State Public Defender, Joan E. Mounteer, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

In this case, we address the use of deadly physical force in self-defense, which is established by statute under section 18–1–704, 6 C.R.S. (1999). The defendant, Tristan Toler, shot and killed Christy Martinez, claiming self-defense. Toler objected to the jury instruction defining self-defense, claiming that the instruction could have improperly misled the jury to believe that a trespasser must "retreat to the wall" before using physical force to defend himself. Despite Toler's objection, the trial court gave the jury instruction, and the jury convicted Toler of second degree murder. The court of appeals concluded that the jury instruction erroneously imposed a limitation on Toler's right to claim self-defense and reversed. *See People v. Toler*, 981 P.2d 1096, 1098 (Colo.App.1998).

We hold that under section 18–1–704 a person does not have to "retreat to the wall"

before using deadly force to defend himself, unless the person was the "initial aggressor" in the encounter, even if he was in a place he had no right to be. Although a trespasser's right to use force in self-defense may be limited by other considerations not present in this case, a trespasser who is entitled to use physical force in self-defense must "retreat to the wall" before using physical force to defend himself only when the trespasser is also the "initial aggressor." Under the facts of this case, the jury instruction on self-defense could have misled the jury to believe erroneously that Toler, since he was where he had no right to be (i.e., a trespasser), had a duty to "retreat to the wall" before using deadly force in self-defense. Because under Colorado law only an initial aggressor has a duty to retreat, the jury instruction in this case was erroneous. Thus, we affirm the court of appeals decision, and we remand this case to that court with instructions to return it to the trial court for a new trial.

## II. FACTS AND PROCEDURAL HISTORY

Toler and two of his companions—fellow gang members Dominic Baca and Eugene Sanchez—consumed alcohol and LSD, and were walking through the neighborhood in which some of their companions lived. Toler carried a 7.65mm semi-automatic pistol, but neither Baca nor Sanchez had a gun. On the way to the house of a fellow gang member, Baca and Sanchez decided to steal the car stereo from a Geo Tracker they saw parked on the street. While Baca and Sanchez broke into the car and removed the stereo, Toler acted as a lookout.

As Toler, Baca, and Sanchez walked away from the Tracker with the stereo, Christy Martinez, the owner of the vehicle, approached the car with his cousin, Frank Galvan, and his uncle, Phillip Quintana. Martinez, Galvan, and Quintana noticed Toler and his friends and saw that Martinez's car

stereo had been stolen. Martinez and Galvan briefly chased Toler and his companions on foot, returning to the Tracker after losing sight of Toler and the others. Martinez, Galvan, and Quintana—all of whom had been drinking during the day—got into Martinez's Tracker and drove through the neighborhood in search of the people who stole Martinez's stereo.

Quintana and Galvan testified that Martinez drove very fast through several streets and alleys in the area trying to find the thieves and recover his stereo. Quintana and Galvan stated that Martinez was very angry that his stereo had been stolen. At no time during this pursuit did Martinez, Galvan, or Quintana possess a gun or other weapon.

Quintana and Galvan testified that as Martinez drove down a street in the neighborhood they spotted two of the individuals they had been chasing, and the individuals ran across the street in front of the Tracker. Galvan testified that after Toler and Baca ran across the street and into a yard on the side of a house, Galvan and Martinez stopped the car and chased the two suspected thieves. Galvan stated that as he and Martinez closed in upon Toler and Baca, Baca climbed over the 6-foot fence[1] located at the rear of the yard and Toler began shooting at them. Galvan testified that Martinez crouched when Toler started shooting but was unable to take cover because he was in an exposed area of the yard. Galvan estimated that he and Martinez were roughly 20–25 feet away from Toler at the time Toler initially opened fire.[2]

After Toler fired several shots, Martinez rose from his crouched position, said something to Galvan, and ran at Toler. Toler again fired at Martinez, and Martinez screamed that he had been shot. Martinez briefly fought with Toler, punched him, and then fell to the ground. At the same time, Galvan ran toward Toler, grabbing him and punching him after Martinez fell down. Galvan said that because he saw his uncle and

---

1. Although at times during the trial various persons referred to the fence as being 8 feet tall, an investigator with the Public Defender's Office testified that she measured the fence at 6 feet, 2 inches.

2. Dr. Wahe, the coroner who performed the autopsy on Martinez, testified that because medical personnel who operated on Martinez cleaned his wounds, Wahe could not determine how far Toler was from Martinez when Toler shot him.

police officers run into the yard and thought they would subdue Toler, he climbed over the fence to pursue Baca. Toler fled out of the yard on foot, but the police quickly captured and arrested him.

Dr. Wahe testified that Martinez had been shot 4 to 6 times,[3] including shots to the arms, legs, chest and stomach. The coroner stated that one of the gunshots entered Martinez's left arm from behind Martinez and went through his arm into his chest, causing the fatal wound by penetrating one of Martinez's lungs and his heart. Dr. Wahe also said that Martinez's blood alcohol level was 0.1333 percent when he was brought to the hospital for treatment of the gunshot wounds.[4]

The People charged Toler with second degree murder, later amending the charge to first degree murder. At trial, Toler's central contention was that he shot Martinez in self-defense. The defense argued that Toler reasonably feared that Martinez was going to cause him great bodily harm or death, and that shooting Martinez was a reasonable response to Martinez's aggression. The defense also argued that shooting Martinez was a reasonable action for someone who was raised in the abusive conditions in which Toler spent his childhood and who was affiliated with a gang.

Although Toler did not testify at trial, the prosecution introduced into evidence the videotape of an interview he conducted with the police after he shot Martinez. During this interview, Toler stated that he had consumed alcohol and LSD that afternoon and that he and his companions were on the way to their friend's house when they noticed Martinez's Tracker following them. Toler said that he had "no idea" why Martinez and the others were after him and his friends, and that he and his friends were afraid and ran from the Tracker. Toler said that as Martinez and Galvan pursued him and Baca into the yard, Toler was "afraid for his life" and thought he saw Martinez reaching into his coat for what Toler assumed was a gun. According to Toler, because he thought Martinez was in a rival gang and was going to harm or kill him, Toler closed his eyes and started shooting at Martinez and Galvan, intending only to scare the pursuers, not to shoot them.

Consistent with Toler's claim of self-defense, the jury received a jury instruction about a person's right to use deadly force to resist unlawful force. Jury Instruction No. 14 stated that the defendant's theory of the case was self-defense and explained to the jury the principles of self-defense patterned after statutory language, caselaw, and CJI–Crim No. 7:68–7(15) (1983).[5] Toler objected

3. Dr. Wahe stated that because some of the bullets entered, exited, and re-entered Martinez's body in various places, he could not determine precisely how many times Martinez had been shot.

4. For comparison, a person who drives a vehicle with a blood alcohol level of 0.1000 or higher is presumed to be driving under the influence of alcohol. See § 42—4—1301(5)(c), 11 C.R.S. (2000)

5. Jury Instruction No. 14 read in pertinent part:

The evidence presented in this case has raised the affirmative defense of self-defense. It is an affirmative defense to the crimes of Murder in the First Degree, Murder in the Second Degree, and Manslaughter (Heat of Passion) that the Defendant used physical force upon another person (1) in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person and (2) he used a degree of force which he reasonably believed to be necessary for that purpose.

Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate **and** (1) he had reasonable grounds to believe and did believe that he or another person was in imminent danger of being killed or of receiving great bodily injury, **or** (2) the other person was committing or reasonably appeared to be about to commit assault.

A person is not justified in using physical force if (1) with the intent to cause bodily injury or death to another person, he provokes the use of physical force by that other person; **or** (2) he is the initial aggressor, except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force. However, if the Defendant was not the initial aggressor, and was where he had a right to be, he was not required to retreat to a position of no escape in order to claim the right to employ force in his own defense.

(Emphasis in original).

to the part of the instruction that Toler argued could mislead a jury to believe erroneously that a trespasser must "retreat to the wall" before using physical force in self-defense, which reads as follows:

> [I]f the Defendant was not the initial aggressor, *and was where he had a right to be,* he was not required to retreat to a position of no escape in order to claim the right to employ force in his own defense.

(Emphasis added.) Over the defendant's objection, the trial court included the "right to be" language in the instruction, concluding that it was required by law.

During closing arguments, the prosecution urged the jury to reject the defense's claim of self-defense. The prosecutor argued that Toler was the initial aggressor and therefore not entitled to claim self-defense. In addition, the prosecutor also argued that because Toler was trespassing at the time he shot Martinez, he could not claim self-defense to excuse his conduct:

> [Toler] does not get the self-defense claim for yet another reason. He also wasn't in a place where he was supposed to be. He was in somebody else's yard. He doesn't get it for that reason.

The jury convicted Toler of second degree murder.[6]

Toler appealed his conviction, arguing that Jury Instruction No. 14 improperly explained the affirmative defense of self-defense, and the court of appeals reversed Toler's conviction. *See People v. Toler,* 981 P.2d 1096, 1098 (Colo.App.1998). The court of appeals examined section 18–1–704, which "sets forth the circumstances in which a person is justified in using physical force" in defense of himself or another person and the exceptions to that privilege. *See id.* at 1097. Under the exceptions to the privilege listed in the statute, the court of appeals noted, there is no exception for a person who is not in a place " 'where he had a right to be.' " *Id.* (quoting § 18–1–704).

In addition to its determination that section 18–1–704 does not impose a duty to retreat on a person who is not "where he has

a right to be," the court of appeals noted that our precedent does not stand for the proposition that a person must be in a place where he has a right to be before using physical force in self-defense. *See id.* The court reviewed cases in which Colorado courts have addressed the "right to be" language in this instruction, and concluded that these cases involve issues other than whether Colorado requires a person to be in a place where he has a right to be before using physical force in self-defense. *Id.* at 1097–98.

Thus, the court of appeals found nothing in the statute or in our caselaw requiring that a person be in a place where he has a right to be before using physical force in self-defense. *See id.* Because it determined that the erroneous instruction might have substantially influenced the verdict or impaired the fairness of the trial, the court of appeals reversed the judgment and remanded the case for a new trial. *Id.* at 1099.

The People petitioned this court and we granted certiorari to consider the following issue:

> Whether the court of appeals correctly invalidated the pattern jury instruction embodying the common law doctrine of retreat to the wall because it contained language not found in the initial aggressor statute.

## III. DISCUSSION

The People argue Jury Instruction No. 14 properly instructed the jury that a person who is not where he has a "right to be" must "retreat to the wall" before using physical force in self-defense. In contrast, the court of appeals held that the "right to be" language could have misled the jury to believe, contrary to Colorado law, that because Toler was a trespasser, he could resort to physical force in self-defense only if he demonstrated that he first retreated to a position of no escape. We agree with the court of appeals.

■ We first review the two major common law trends governing the privilege to use deadly force in self-defense: the "retreat

---

6. "A person commits the crime of murder in the second degree if the person knowingly causes the death of a person." § 18–3–103(1), 6 C.R.S. (1999).

to the wall" doctrine and the "no duty to retreat" doctrine. After demonstrating that Colorado historically followed the "no duty to retreat" rule at common law, we assess the historical and current codifications of the doctrine in this state. Under the current statutory scheme a person may use physical or deadly force in self-defense only under certain conditions, and, with one exception, a person entitled to use such force has no duty to retreat before doing so. The statute only imposes a duty to retreat upon a specifically identified class of persons—"initial aggressors." We hold that neither section 18–1–704 nor our caselaw requires a non-aggressor who is entitled to use deadly physical force in self-defense to "retreat to the wall" before using such force, whether or not the person is where he has a right to be.

### A. Use of Deadly Force in Defense of Person at Common Law

■ Generally speaking, a person does not have to try to escape before using reasonable non-deadly physical force to defend against unlawful force by an aggressor. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 5.7(f) (1986). However, English common law required a person to "retreat to the wall" before using deadly force in self-defense. *See Idrogo v. People,* 818 P.2d 752, 754 (Colo.1991).[7]

■ Under the "retreat to the wall" doctrine, a person is entitled to employ deadly force in self-defense only if the person demonstrated that no reasonable means of escape existed at the time he killed his assailant. *See* Perkins, *supra* note 7, at 140–41.

Exceptions to the doctrine developed such as the "castle doctrine," which allows a person in his own home to use deadly force in self-defense without first retreating even if a reasonably safe means of escape exists. *See, e.g.,* Conn. Gen.Stat. § 53a–19(b) (1999); Model Penal Code § 3.04(2)(b)(ii)(A) (1985). A substantial number of American jurisdictions still apply variations of the "retreat to the wall" rule in self-defense cases. *See, e.g., State v. Gartland,* 149 N.J. 456, 694 A.2d 564, 569–70 (1997) (discussing application of "duty to retreat" and castle doctrine when a woman defends herself against a co-habitant spouse).[8]

■ In contrast to the "retreat to the wall" doctrine, many jurisdictions developed a "no duty to retreat" rule, or "true man" doctrine for the use of physical force in self-defense. *See, e.g., Beard v. United States,* 158 U.S. 550, 560–561, 15 S.Ct. 962, 39 L.Ed. 1086 (1895); *State v. Renner,* 912 S.W.2d 701, 703–04 (Tenn.1995).[9] The "true man" doctrine stands for the proposition that a "true person," or someone who is without fault, does not have to retreat from an actual or threatened attack even if he could safely do so before the person may use physical force in self-defense. *See* 40 Am.Jur.2d *Homicide* § 164 (1999). Furthermore, the "true person" does not have to consider whether a reasonable person in the situation would opt to retreat to safety rather than resorting to physical force to defend against unlawful force. *See id.; Renner,* 912 S.W.2d at 704. Typically, jurisdictions state that the "true person" doctrine applies when (1) the defendant is "without fault in provoking the con-

<hr/>

7. *See also* Rollin M. Perkins, *Self–Defense Re-Examined,* 1 U.C.L.A. L.Rev. 133, 137–45 (1953) (discussing the history of the "retreat to the wall" doctrine and self-defense generally).

8. *See also, e.g.,* Alaska Stat. § 11.81.335(b) (Michie 1999) (requiring that a person retreat if possible with complete safety before using deadly force, except in defense of premises or within the scope of peace officer's authority); Del.Code Ann. tit. 11, § 464(e) (1999) (imposing conditional duty to retreat before using deadly physical force); N.J. Stat. Ann. § 2C:3–4 (West 2000) (stating that deadly force is not justifiable if the actor knew that he could safely retreat, surrender possession of a thing to a person asserting a right thereto, or comply with a demand to refrain

from an action which he has no duty to take); *Weiand v. State,* 732 So.2d 1044, 1049–57 (Fla. 1999) (discussing and modifying Florida's duty to retreat before using deadly physical force); *Burch v. State,* 346 Md. 253, 696 A.2d 443, 457–58 (1997) (discussing Maryland's duty to retreat).

9. *See also Cook v. State,* 467 So.2d 203 210–11 (Miss.1985); *Earl v. State,* 111 Nev. 1304, 904 P.2d 1029, 1031 (1995); Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 5.7(f) (1986) ("The majority of American jurisdictions holds that the defender (who was not the initial aggressor) need not retreat, even though he can do so safely, before using deadly force upon an assailant whom he reasonably believes will kill him or do him serious bodily harm.").

frontation;" (2) the defendant is "in a place where he has a lawful right to be;" and (3) the defendant has a reasonable fear that the victim is about to cause the defendant immediate serious bodily harm or death. *See, e.g., Beard,* 158 U.S. at 561–62, 15 S.Ct. 962; *Renner,* 912 S.W.2d at 704.

■ Like many jurisdictions, Colorado adopted as part of its common law the "no duty to retreat" rule for the use of deadly force in self-defense. *See Boykin v. People,* 22 Colo. 496, 504, 45 P. 419, 422 (1896). In *Boykin,* this court recognized that in some instances a person may have a duty to retreat before using deadly force, but we adopted the "no duty to retreat" doctrine as the general rule for this state:

> There are, doubtless, cases where it is the duty of the party assaulted to retreat to the wall before taking human life, as, for example, where the case is one merely of simple assault, or where the parties engage in mutual combat, or where the defendant is the assailant, and has not in good faith declined further struggle before resorting to self-defense, or has provoked the assault with intent to commit a felony. . . .
>
> But where a defendant is where he has a right to be, as, for example, a police officer engaged in making an arrest, and is assaulted by the deceased in a way that defendant honestly and in good faith believes, and the circumstances being such as would induce a like belief in a reasonable man, that he is about to receive at the hands of his assailant great bodily harm, or to lose his life, the defendant, if he did not provoke the assault, or is not within some of the exceptions above noted, is not obliged to retreat or flee to save his life, but may stand his ground, and even, in some circumstances, pursue his assailant until the latter has been disarmed or disabled from carrying into effect his unlawful purpose; and this right of the defendant goes even to the extent, if necessary, of taking a human life.

*See id.*

■ Our cases following *Boykin* consistently stand for the proposition that, with the limited exceptions expressed in *Boykin,* Colorado does not impose a duty to retreat before a person may use physical force in self-defense. In *People v. La Voie,* for example, we held that the defendant "had the right to defend himself" when the passengers of the another car approached the defendant after colliding with his car, and we did not impose on the defendant a duty to retreat. *See* 155 Colo. 551, 553–55, 395 P.2d 1001, 1002–03 (1964). Similarly, in *Enyart v. People* this court reiterated our "no duty to retreat" rule and noted that a person must "retreat to the wall" only in limited circumstances, such as if the person was engaged in mutual combat. *See* 67 Colo. 434, 438, 180 P. 722, 723 (1919). In *Enyart,* we reversed the defendant's conviction because one of the jury instructions might have misled the jury to believe that the defendant, who "was attending his own business, in his own bank," had to retreat to a position of no escape before using deadly physical force. *See* 67 Colo. at 439–40, 180 P. at 724.

■ More recently, in *Idrogo,* we refused to accept the People's argument that the duty to retreat arises before a defendant may use deadly physical force in self-defense:

> The People argue that even though there is no general duty to retreat before acting in self-defense, such a duty arises before a defendant may use deadly force. We reject this argument.

*See* 818 P.2d at 754. *Idrogo* and our other cases demonstrate that our caselaw consistently stands for the proposition that there is no duty to retreat before using deadly force in self-defense except in certain specifically identified circumstances.

### B. Colorado's Statutory Privilege to Use Physical and Deadly Force in Defense of a Person

Colorado's statutes reflect our common law's "no duty to retreat" rule. At least as early as 1868, Colorado's statutes defined the circumstances under which homicide in self-defense was justifiable without requiring that a person "retreat to the wall" before using deadly force. *See* C.R.S. Chap. XXII, Div. IV, §§ 28–30 (1868). Several versions of Colorado's statute describing this privilege failed

to contain any reference to a duty to retreat before a person could use physical and deadly force in self-defense. *See, e.g.,* § 40–2–13, 3 C.R.S. (1953); § 40–2–13 (1963).[10]

When the General Assembly adopted the statute that became section 18–1–704—Colorado's current self-defense statute—the legislature expressly noted that the statute codified Colorado's common law of self-defense, including the "no duty to retreat" doctrine. In the comment to the section, the legislature stated, "Subsection (2) omits the doctrine of 'retreat to the wall' which has never been the law in Colorado." *See* § 40–1–804, 12 C.R.S., cmt. (1971 Supp.). In addition to the legislature's comment, we specifically noted in *Idrogo* that section 18–1–704(2) "contains no language reflecting any intention by the General Assembly to revive the doctrine of retreat." *See* 818 P.2d at 755.

Like earlier versions of the self-defense statute, section 18–1–704 defines the circumstances under which a person may use physical force, including deadly force, in self-defense.[11] Under section 18–1–704(2), a person's use of deadly force is justified only if the person reasonably believes that a lesser degree of force is inadequate, and either: (a) the person has reasonable grounds to believe, and does believe, that he or another person is in imminent danger of being killed or receiving great bodily injury; (b) the other person is using or reasonably appears to be using physical force against someone while committing a burglary; or (c) the other person is committing or reasonably appears about to commit kidnapping, robbery, sexual assault, or assault. *See* § 18–1–704(2). Thus, under section 18–1–704(2), a person who faces one of the factual circumstances set forth in 704(2)(a)-(c) and who reasonably believes that a lesser amount of force is inadequate is entitled to use deadly force in self-defense.

The statute defines two categories of persons who are not justified in using physical force under any circumstances. First, a person may not claim self-defense if the person, with intent to cause bodily injury or death to another person, provoked the use of unlawful physical force by that other person. *See* § 18–1–704(3)(a). Second, a person may not

---

**10.** By comparison, we note that some jurisdictions have expressly codified the "no duty to retreat" rule. *See, e.g.,* Ariz.Rev.Stat. § 13–411(B) (2000). We also note that, in contrast to our statutes, some jurisdictions expressly impose the duty to retreat before using deadly force in self-defense. *See, e.g.,* Haw.Rev.Stat. § 703–304(5)(b) (1999); N.J. Stat. Ann. § 2C3:–4(b)(2)(b) (West 2000). A third category of statutes leaves issues such as retreat to the common law of the state. *See, e.g.,* La.Rev.Stat. § 14:20, Rptrs. cmt. (1) (West 2000); Minn.Stat. Ann. § 609.065, advisory committee cmt. (West 2000).

**11.** Section 18–1–704 reads:

(1) Except as provided in subsections (2) and (3) of this section, a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for that purpose.

(2) Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and:

(a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury; or

(b) The other person is using or reasonably appears about to use physical force against an occupant of a dwelling or business establishment while committing or attempting to commit burglary as defined in sections 18–4–202 to 18–4–204; or

(c) The other person is committing or reasonably appears about to commit kidnapping as defined in section 18–3–301 or 18–3–302, robbery as defined in section 18–4–301 or 18–4–302, sexual assault as set forth in section 18–3–402 or 18–3–403, or assault as defined in sections 18–3–202 and 18–3–203.

(3) Notwithstanding the provisions of subsection (1) of this section, a person is not justified in using physical force if:

(a) With intent to cause bodily injury or death to another person, he provokes the use of unlawful physical force by that other person; or

(b) He is the initial aggressor; except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force; or

(c) The physical force involved is the product of a combat by agreement not specifically authorized by law.

claim self-defense if the physical force defended against is the product of a "combat by agreement not specifically authorized by law." *See* § 18–1–704(3)(c). The statute contains no exceptions that would permit a person fitting under either subsection 704(3)(a) or 704(3)(c) to use physical force in self-defense.

■ Along with the two categories of persons who may not assert the privilege of self-defense to justify the use of physical force, the statute defines a third category of persons—i.e., "initial aggressors"—who must retreat before employing physical force in self-defense. The statute denies an "initial aggressor" the privilege of using physical force in self-defense unless the initial aggressor withdraws from the encounter and "effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force." § 18–1–704(3)(b). As we explained in *Idrogo*, this section "expressly requires *retreat* before physical force is justifiable where the defendant is the initial aggressor." 818 P.2d at 756 (emphasis added). *See also People v. Willner*, 879 P.2d 19, 22 (Colo.1994).

■ Thus, section 18–1–704 establishes the rights of four categories of persons with respect to the privilege of using physical force in self-defense: (1) people who with the intent to cause bodily injury or death provoke the use of force against themselves may not claim self-defense; (2) people who engage in unauthorized combat by agreement may not claim self-defense; (3) "initial aggressors," who first "withdraw and communicate," that is, "retreat," may then use physical force in their own defense; and (4) all other persons, i.e., those who do not fall within the first three groups, may use physical force, including deadly physical force, in accordance with sections 18–1–704(1) and (2). *See* § 18–1–704, 6 C.R.S. (1999).

### C. "Right To Be"

Having analyzed Colorado's self-defense doctrine and demonstrated that this state imposes a "duty to retreat" only on "initial aggressors," we turn to the People's argument that a trespasser must "retreat to the wall" before using physical force in self-defense. The People argue that Instruction No. 14 properly informed the jury that because Toler was not where he had a "right to be" when he shot Martinez, the affirmative defense of self-defense was unavailable to Toler. We disagree.

Although both our caselaw and CJI–Crim. 7:68–7(15) have approved language similar to the "right to be" language, we have never held that a person must retreat to the wall before using force in self-defense if the person is where he has no right to be. Such a conclusion is required neither by section 18–1–704 nor by our precedent, and would contravene the right of some trespassers to defend themselves against unlawful physical force.

Many jurisdictions that adhere to the "true man" doctrine incorporate the notion of the "right to be" as an element of the privilege. In *Beard*, for instance, the United States Supreme Court concluded, partly based upon the defendant's right to be in the place where he used deadly force, that the defendant's conduct was justified when he shot one of three boys who attempted to take possession of one of the defendant's cows:

> The accused *being where he had a right to be,* on his own premises . . . at the time the deceased approached him in a threatening manner, and not having by language or conduct provoked the deceased to assault him, the question for the jury was whether, without fleeing from his adversary, he had, at the moment he struck the deceased, reasonable grounds to believe, and in good faith believed, that he could not save his life or protect himself from great bodily harm except by [killing the deceased].

158 U.S. at 160 (emphasis added). Other courts have likewise explained the justification for the use of physical force in self-defense in terms of the defendant's right to be in the place where he defended himself. *See, e.g., Renner,* 912 S.W.2d at 704.

Similarly, we have described the justification for using physical force in self-defense in terms of the defendant being "where he had a right to be." In *Boykin,* we held that an

officer who shot a man while trying to arrest him was justified and did not have to retreat before using force in self-defense, and we noted that the officer was "where he has a right to be." *See* 22 Colo. at 504, 45 P. at 422. In *Enyart*, we held that because the jury could have believed that the defendant was "attending to his own business, in his own bank" and had not otherwise provoked the deceased's use of force, an instruction that could have led the jury to conclude that the defendant could have used a lesser degree of force by retreating was erroneous. *See* 67 Colo. at 439–440, 180 P. at 724.[12]

Although in *Boykin* and similar cases we approved of the use of "right to be" language in jury instructions about self-defense, the defendant's status as a trespasser has not been a central element in our decisions. For example, in *Boykin*, the defendant's "right to be" where he was turned on his status as a police officer making a lawful arrest, not on whether the defendant was trespassing. *See* 22 Colo. at 504, 45 P. at 422. Additionally, in other cases we have discussed an "innocent victim's" privilege to use physical force in self-defense without directly referring to the person's status as a trespasser or "right to be" in a particular place. *See Idrogo*, 818 P.2d at 756; *Willner*, 879 P.2d at 22, 24. Furthermore, in *Willner* we approved of a jury instruction about the use of deadly force in self-defense that contained no reference to the defendant's right to be where he was. *See* 879 P.2d at 23–25. Thus, although we have approved of the "right to be" language in some cases discussing the use of force in self-defense, we have never held that a trespasser must retreat to the wall before using force in self-defense or that a person must be where he has a right to be before using such force.

 Like our caselaw, which contains no requirement that trespassers retreat to the wall before using defensive physical force, section 18–1–704 contains no reference to a person's right to be in the place where he uses defensive physical force. Our analysis

of section 18–1–704, *supra* Part III.B, demonstrates that the statute describes the privilege to use physical force in terms of four categories of people: those who with intent to cause bodily harm provoke the use of force against themselves, participants in unauthorized mutual combat, initial aggressors, and all others. Of these categories, only "initial aggressors" have a duty to retreat before using physical force to defend themselves. *See* 18–1–704(3)(b). The statute contains no references to "trespassers" or any other indication that a person who is not where he has a right to be must retreat before using physical force in self-defense. Thus, requiring trespassers to retreat before using defensive physical force would extend the duty beyond the only class of persons identified by section 18–1–704 as subject to the duty to retreat.

 Just as none of our cases requires that a trespasser retreat to the wall before using physical force in self-defense, CJI–Crim. 7:68–7(15) stands only for the proposition that a non-aggressor has no duty to retreat and is not designed to instruct the jury that a trespasser has a duty to retreat. In *Idrogo*, we held that under the facts of that case the jury should have been instructed that a non-aggressor has no duty to retreat, even if the non-aggressor could have safely done so. *See* 818 P.2d at 756. We recognized that Colorado law imposes the duty to retreat only in the specific circumstances described in section 18–1–704(3) (i.e., initial aggressors), and we refused to extend that duty:

> Section 18–1–704(2) contains no language restricting the circumstances in which a non-aggressor may use physical force, including deadly physical force, when such a person believes, on reasonable grounds, that such conduct is necessary to avoid great bodily harm.

*Id.* at 756. Thus, in *Idrogo* we recognized and reaffirmed the fundamental distinction that exists in the self-defense statute: non-aggressors have no duty to retreat and initial

---

**12.** *See also, e.g., People v. Collins*, 730 P.2d 293, 304, 306 n. 1 (Colo.1986) (stating that jury instructions, which included "right to be" language, "fully apprised the jury of the law of self-

defense"); *Hinton v. People*, 169 Colo. 545, 553, 458 P.2d 611, 614 (1969) (finding no error in jury instruction that included "right to be" language).

aggressors must retreat before using force in self-defense.

Because the jury could have determined that the defendant in *Idrogo* was not the initial aggressor, they should have been informed that if the defendant was not the initial aggressor, then he had no duty to retreat. *See id.* Without the proper instruction, the jury might have concluded that even as the non-aggressor the defendant could have retreated and that the defendant's use of force was unreasonable in light of the possibility of retreat:

> [The instruction given to the jury] does not inform the jury, directly or indirectly, that if Idrogo were not the initial aggressor he need not retreat at all to be entitled to use deadly force if he believed such force to be necessary in light of [the deceased's] conduct and the belief was based on reasonable grounds. Because the jury could reasonably have concluded on the basis of the instructions given at trial that Idrogo's failure to retreat was evidence that a lesser degree of force would have been adequate, an instruction explaining that Idrogo had no duty to retreat would not ... have been redundant.

*Id.* at 756. We concluded that the jury should have been given an instruction similar to the language of CJI–Crim. 7:68–7(15) to ensure that the jury does not consider the possibility of retreat as a limitation on a non-aggressor's claim of self-defense.

A person who is not where he has a right to be in many instances retains the privilege to use force in self-defense irrespective of his status as a trespasser. For example, if the initial aggressor in an assault withdraws and communicates his intention to withdraw to the victim of the assault, the aggressor may defend himself. *See* § 18–1–704(3)(b). In such a circumstance, nothing in the statute suggests that the initial aggressor's ability to defend himself turns on whether he is where he has a right to be—it is solely an issue of whether the initial aggressor withdraws and communicates as required by the statute. *See id.*

Similar reasoning would apply in the case of a victim of an attempted robbery who flees onto a third person's property before resorting to physical force against the would-be robber. Nothing in the statute suggests that a robbery victim forfeits the privilege to defend himself simply by the act of trespassing onto the property of a third person.

▪ In addition to instances in which a person trespasses while fleeing from an attack, other scenarios suggest that trespassers do not forfeit their rights to self-defense merely by the act of trespassing. For instance, if the owner or occupant of property confronts a trespasser with unlawful force (e.g., by using deadly force without reasonable grounds to believe that the trespasser committed or intends to commit a felony in addition to the trespass), then the trespasser retains the right to defend himself without having to "retreat to the wall." *See State v. Perigo,* 70 Iowa 657, 28 N.W. 452, 457 (1886); *People v. Townes,* 391 Mich. 578, 218 N.W.2d 136, 141–142 (1974).

In the situations we have suggested, as well as others we have not addressed or considered, a trespasser would not be required to "retreat to the wall" before using physical force in self-defense. Because neither our statutes nor our caselaw requires us to conclude that a trespasser must in every instance retreat to a position of no escape before using physical force in self-defense, we cannot agree with the position urged by the People.

▪ Although our conclusion is that neither section 18–1–704 nor our cases require that a trespasser must "retreat to the wall" before using force in self-defense, a trespasser is not necessarily in the same position as an "innocent person" or "true man" in terms of employing defensive physical force. In addition to the justifiable use of physical force pursuant to section 18–1–704, a person in possession or control of any building or premises may lawfully use reasonable force, including deadly force in some instances, against trespassers. *See* § 18–1–705, 6 C.R.S. (1999).[13] Furthermore, the occupant

---

13. 18–1–705 states:

> A person in possession or control of any building, realty, or other premises, or a person

of a dwelling may lawfully use physical force, including deadly force, against trespassers in certain situations. *See* § 18–1–704.5, 6 C.R.S. (1999).[14] Under these statutes, a trespasser who is subjected to *lawful* physical force by the owner or occupant of property or premises has no privilege to use physical force in self-defense because the privilege under section 18–1–704 applies only when the defendant faces *unlawful* force. Thus, because trespassers face the possibility of lawful physical force by a person defending against the trespass, they are not in the same position as an otherwise innocent person or "true man" with respect to the privilege of using force in self-defense.

## IV. APPLICATION

■ Having determined that under Colorado law only a person who is an "initial aggressor" must "retreat to the wall" before using physical force in self-defense, we consider whether the court of appeals properly reversed Toler's conviction and remanded the case for a new trial. Because Jury Instruction No. 14 could have caused the jury to assess Toler's self-defense claim in a manner inconsistent with Colorado law, we affirm the court of appeals decision.

The prosecution never argued that Toler fell within either of the two categories of persons who may not claim self-defense under sections 18–1–704(3)(a),(c) to justify the use of physical force against another person. Thus, Toler either was the initial aggressor and had a duty to retreat before using force in self-defense, or he was not the initial aggressor and could use force in accordance with the terms of section 18–1–704.

The question of whether Toler was the "initial aggressor" in the encounter with Martinez and Galvan was submitted to the jury as a factual issue for their determination. If the jury determined that Toler was the initial aggressor as the prosecution argued, then, since there was no evidence that Toler withdrew from the encounter with Martinez or communicated his intent to withdraw from the encounter, Toler would not have been entitled to claim self-defense.

On the other hand, because it was a jury question, they might have concluded that Toler was not the initial aggressor even if they believed Toler participated as a lookout in the theft of Martinez's car stereo. Toler did not directly confront or threaten Martinez and the others before Martinez chased him, and Toler and his companions fled for several blocks while being pursued by three men in a car. If the jury accepted Toler's account of the shooting, then they may have believed that Toler thought Martinez was reaching into his coat for a gun when Toler shot him. Thus, based on the evidence presented and the arguments made at trial, the jury could have concluded that Toler was not the initial

who is licensed or privileged to be thereon, is justified in using reasonable and appropriate physical force upon another person when and to the extent that it is reasonably necessary to prevent or terminate what he reasonably believes to be the commission or attempted commission of an unlawful trespass by the other person in or upon the building, realty, or premises. However, he may use deadly force only in defense of himself or another as described in section 18–1–704, or when he reasonably believes it necessary to prevent what he reasonably believes to be an attempt by the trespasser to commit first degree arson.

14. [14]18–1–704.5 states:

(1) The general assembly hereby recognizes that the citizens of Colorado have a right to expect absolute safety within their own homes.

(2) Notwithstanding the provisions of section 18–1–704, any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

(3) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from criminal prosecution for the use of such force.

(4) Any occupant of a dwelling using physical force, including deadly physical force, in accordance with the provisions of subsection (2) of this section shall be immune from any civil liability for injuries or death resulting from the use of such force.

aggressor and hence not subject to a duty to retreat under section 18–1–704(3)(b).

Despite the possibility that the jury could have concluded that Toler was not the initial aggressor, Instruction No. 14 implied that Toler could not claim self-defense because he was in a place he had no right to be, that is, because he was a trespasser. That Toler was in a place where he had no right to be when he shot Martinez was undisputed. If the jury followed Instruction No. 14, then the jury may have concluded that Toler, solely because he was trespassing when he shot Martinez, had to "retreat to the wall" before being entitled to claim self-defense. Because Toler's companion fled over the fence at the back of the yard, the jury might have concluded that Toler did not "retreat to the wall" before shooting Martinez.

Further complicating the situation, the prosecutor, relying on the "right to be" wording of the instruction, told the jury that Toler was not entitled to claim self-defense because he was a trespasser. This comment may have had the effect of focusing the jury on the erroneous portion of the self-defense instruction.

In sum, under the specific facts presented in this case, the jury may have concluded that Toler was not the initial aggressor even though he participated in the theft of Martinez's car stereo. If the jury concluded that Toler was not the initial aggressor, then Toler had no duty to retreat before using physical force to defend himself. However, if the jury relied on the implication in Instruction No. 14, then they may have determined that Toler, because he was where he had no right to be (that is, he was a trespasser), should have retreated to the wall before using force to defend himself. Such a conclusion contravenes our statute and our precedent. Thus, we agree with the court of appeals that Toler's conviction must be reversed. *See also Idrogo*, 818 P.2d at 757 (requiring a new trial where jury received erroneous instruction about self-defense under section 18–1–704); *Enyart*, 67 Colo. at 439–41, 180 P. at 724 (requiring a trial where jury was erroneously instructed on law of self-defense).

## V. CONCLUSION

Under the facts of this case, Instruction No. 14, which was patterned after CJI–Crim. 7:68–7(15), could have misled the jury to believe that a trespasser must "retreat to the wall" before using physical force in self-defense. Because Colorado does not impose a duty to retreat on any person who may lawfully use physical force in self-defense under the provisions of section 18–1–704 unless the person is an "initial aggressor," Instruction No. 14 could have substantially affected the jury's assessment of Toler's self-defense claim. Thus, we affirm the court of appeals decision reversing Toler's conviction, and we remand the case to that court for return to the trial court for a new trial consistent with this opinion.

Justice RICE and Justice COATS do not participate.