23CA0332 Peo v Tatom 09-04-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0332
Mesa County District Court No. 21CR1831
Honorable Matthew D. Barrett, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael Tyler Tatom,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE BROWN
Dunn and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 4, 2025

---

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Michael Tyler Tatom, appeals the judgment of conviction entered on a jury verdict finding him guilty of first degree burglary, second degree assault, and third degree assault. Tatom contends that (1) the district court erred by ruling midtrial that it would not instruct the jury on self-defense based solely on the prosecution's evidence; (2) the prosecutor committed misconduct in closing argument; and (3) the court should have merged the assault convictions into the burglary conviction. We agree with Tatom's merger argument, so we vacate his assault convictions and remand for the district court to correct the mittimus accordingly. We otherwise affirm.

## I.    Background

¶ 2    In December 2021, an exterior camera captured Tatom walking toward and knocking on Michael Sorrell's front door. Before anyone answered, Tatom walked away. Sorrell testified that he heard a "loud bang on [his] door," so he grabbed his gun and went outside to look around. Sorrell said that he saw Tatom across the street yelling something at him but did not pay Tatom any attention. Sorrell also said that he did not raise his gun. The

exterior camera did not capture what happened after Sorrell stepped outside.

¶ 3　　As reflected in the interior camera footage, Sorrell calmly walked back inside his home and shut and locked his door.  He walked across his living room and back toward the front door while looking at his phone.  Then he went into his kitchen.  The exterior camera footage shows Tatom walking back up to Sorrell's door after the interior camera footage shows Sorrell walking into his kitchen.  At that point, Sorrell said he heard the "front door coming in," so he ran to the front door and tried to shoot through the window, but his pistol did not fire.

¶ 4　　Twenty-six seconds after Sorrell re-entered his home, the interior camera footage shows that Tatom broke down the door and slammed Sorrell into a wall.  Then Tatom chased Sorrell out of view of the interior camera and into the kitchen where Sorrell said Tatom choked him.  During the struggle, Sorrell's gun went off at least three times, and Sorrell was shot in the hand.

¶ 5　　Eventually, Tatom left Sorrell on the ground and said, "Fuck you.  You're gonna die.  You're bleedin' out anyways."  Sorrell went outside to his neighbor's house with the gun.  Tatom followed

Sorrell, walking slowly and then pausing on Sorrell's front porch. When the neighbors gathered, Tatom approached and yelled at Sorrell to give him the gun. Tatom hit one of Sorrell's neighbors and then walked away.

¶ 6      Several police officers responded to the scene. When Deputy Lee Pratt arrived, he saw Tatom walking in the street. Deputy Pratt asked Tatom to stop, but he was uncooperative. The deputy tased Tatom, had medical staff treat him, and put him in the back of a patrol vehicle in handcuffs. Tatom later tried to leave the patrol vehicle, and the officers had to forcibly put him back.

¶ 7      As captured on body camera footage, Tatom told Deputy Pratt that Sorrell came outside waving his gun and threatening to shoot Tatom. Tatom said that as soon as he started coming toward Sorrell, Sorrell ran inside and tried to lock himself in his house, but at that point, Tatom had "already bum-rushed the door" and "jarred it open." Tatom did not deny breaking down Sorrell's door and assaulting him but said he was defending himself.

¶ 8      The prosecution charged Tatom with first degree burglary, second degree assault, third degree assault, criminal mischief, and

obstructing a peace officer.  A jury convicted Tatom as charged.[1]

The court sentenced Tatom to eight years in the custody of the

Department of Corrections for each of the burglary and second

degree assault convictions, to be served concurrently with each

other and with the other sentences.

## II.    Self-Defense Instruction

¶ 9      Tatom contends that the district court erred when it ruled

midtrial that a self-defense instruction was not warranted based on

the prosecution's evidence alone.  We are not persuaded.

### A.    Standard of Review and Applicable Law

¶ 10     For a defendant to be entitled to an instruction on an

affirmative defense, there must be "some credible evidence" to

support it.  *Pearson v. People*, 2022 CO 4, ¶ 16 (quoting

§ 18-1-407(1), C.R.S. 2025).  We review de novo whether there was

sufficient evidence to support a self-defense jury instruction.

---

[1] The prosecution also charged Tatom with third degree assault for hitting the neighbor.  At the close of the prosecution's case, the district court granted Tatom's motion for judgment of acquittal on that charge based on the neighbor's testimony that he was not harmed.  Tatom does not appeal his convictions or sentences for criminal mischief or obstructing a peace officer.

*People v. Newell*, 2017 COA 27, ¶ 19.  And in doing so, "we consider the evidence in the light most favorable to the defendant." *Id.*

¶ 11    "The small quantum of evidence that must appear in the record in order to warrant an instruction on an affirmative defense may come from any source, even from the prosecution." *Id.* at ¶ 21; *see also* § 18-1-407(1) ("'Affirmative defense' means that unless the state's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, shall present some credible evidence on that issue.").  But "whether there is credible evidence to support each element of an affirmative defense is a question for the court rather than the jury." *People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011); *see also People v. Hill*, 934 P.2d 821, 826 (Colo. 1997) ("If a trial court determines as an issue of law[] that no evidence exists in the record to support an affirmative defense, there is no issue of fact for the jury to resolve.").

¶ 12    Under Colorado law,

> a person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force

> which he reasonably believes to be necessary for that purpose.

§ 18-1-704(1), C.R.S. 2025. The "touchstone of self-defense" is a "[r]easonable belief that one is defending against the use of unlawful force," and "there must be evidence from which the jury could determine that the defendant held such a reasonable belief." *People v. Suazo*, 867 P.2d 161, 169 (Colo. App. 1993). Under these circumstances, a reasonable person "means an objectively reasonable individual." *People v. Luna*, 2020 COA 123M, ¶ 26.

¶ 13    A person is not justified in using force in self-defense if they are the initial aggressor — the one who initiated the physical conflict — unless they first retreat and the non-aggressor continues or threatens the use of unlawful physical force. § 18-1-704(3)(b); *see Castillo v. People*, 2018 CO 62, ¶ 41; *People v. Toler*, 9 P.3d 341, 351-52 (Colo. 2000). On the other hand, a non-aggressor has "no duty to retreat" before using force in self-defense. *Toler*, 9 P.3d at 351-52. But if the initial aggressor withdraws from the encounter and effectively communicates that withdrawal, then "the original non-aggressor becomes the aggressor when the original non-aggressor 'continues or threatens the use of unlawful physical

force.'" *Castillo*, ¶ 43 (quoting § 18-1-704(3)(b)). When the original non-aggressor becomes the aggressor, they are "no longer entitled to act in self-defense." *People v. Goedecke*, 730 P.2d 900, 901 (Colo. App. 1986); *see also People v. Sepeda*, 581 P.2d 723, 730-31 (Colo. 1978) (Although a defendant "need not retreat to the wall before defending himself, [and] may stand his ground and even, in some circumstances, pursue his assailant until the assailant has been disarmed or otherwise deterred from his violent purpose," the defendant may not rely on that rule "when he is no longer under attack, but has himself become the assailant." (citing *Almond v. People*, 135 P. 783, 784 (Colo. 1913))).

### B.    Additional Background

¶ 14    When the prosecution rested, defense counsel asked the district court to instruct the jury on self-defense based on the prosecution's evidence. Counsel argued that Tatom "made statements to the police officers that he went after Mr. Sorrell" because "Sorrell pointed a gun at him [and] threatened him" and that Tatom "broke down the door in an attempt to disarm Mr. Sorrell." The prosecutor responded that Tatom's version of events was "so improbable," emphasizing that it was unclear when the

7

alleged threat occurred based on Tatom's statements in the bodycam footage and that there was "a break in time."

¶ 15    The court noted that the last witness the prosecution presented was an investigator who said that Tatom told him that Sorrell "didn't have time to lock that door because I was on his ass." The court reasoned that the investigator's testimony "indicated that [Tatom] was literally chasing [Sorrell] as he's going into the house. Chasing him because he had threatened him with a gun." But the prosecutor responded that "[t]he threat component [Tatom's] talking about [is] minutes, and I mean minutes before that."

¶ 16    The court reviewed the interior and exterior camera footage again and determined that the footage showed Sorrell "calmly" walking into his home, turning around, and deadbolting the door. Then, after "[twenty-six] full seconds, almost half a minute between whatever happened outside and Mr. Sorrell going back inside his home, closing the door and dead bolting it," Tatom broke down the door. The court ruled,

> Under these circumstances, there can be no reasonable belief on the part of anyone, including [Tatom], that he needed to act in self-defense from any imminent use of unlawful force upon him by Mr. Sorrell, period.

> That is far too long of a break in time for there to be a justification for [the] affirmative defense to be used, particularly under the circumstances here where [Tatom] is breaking into someone's home.

¶ 17 Tatom testified in his defense. At the conclusion of the evidence, Tatom renewed his request for a self-defense instruction, the prosecutor did not object, and the court agreed to instruct the jury on self-defense.

### C. The District Court Did Not Err by Ruling that Tatom Was Not Entitled to a Self-Defense Instruction Based on the Prosecution's Evidence

¶ 18 Tatom contends that the district court erred by concluding that there was insufficient evidence at the close of the prosecution's case to support a self-defense instruction. As an initial matter, the parties dispute whether Tatom was entitled to an advisory midtrial ruling and whether we should review his contention at all since he elected not to stand on his motion but to present additional evidence. But because we conclude that the court did not err, we need not resolve these disputes.

¶ 19 Tatom was charged with burglary and two counts of assault for breaking down Sorrell's door, choking him, and causing Sorrell to be shot in the hand. Tatom's version of events — told through

9

Deputy Pratt's bodycam footage introduced during the prosecution's case — was that Sorrell waved his gun and threatened Tatom outside, so Tatom chased Sorrell into his own home to disarm him. Crediting Tatom's story, Sorrell was the initial aggressor, and Tatom was the original non-aggressor. Under these circumstances, Tatom may have been legally justified in initially advancing at and disarming Sorrell to defend himself. *See Sepeda*, 581 P.2d at 730-31.

¶ 20    But even according to Tatom, after Sorrell made the initial threat, he ran back inside his own home and at least tried to lock the door. Once Sorrell fled as Tatom described, any reasonable belief Tatom had that Sorrell would use unlawful physical force against him dissipated. *See* § 18-1-704(1); *see also* § 18-1-705, C.R.S. 2025 (authorizing use of reasonable and appropriate physical force to prevent unlawful trespass upon a premises). And once Sorrell withdrew from the encounter and effectively communicated that withdrawal by running back inside his home, Tatom became the aggressor by continuing to pursue Sorrell, breaking down his door, and physically attacking him. *See*

§ 18-1-704(3)(b); *Castillo*, ¶ 43.  When Tatom became the aggressor, he lost the right to claim self-defense.  *Goedecke*, 730 P.2d at 901.

¶ 21    Under these circumstances, Tatom was not entitled to a self-defense instruction.  *See Sepeda*, 581 P.2d at 731 (concluding that a self-defense instruction was "totally irrelevant" when it was undisputed that a "fight ended no later than when [the] defendant fired into the crowd," yet the defendant "continued to fire at his unarmed and apparently helpless foe"); *State v. Knotts*, 421 S.E.2d 917, 924 (W. Va. 1992) (the defendant became "the physical aggressor and lost any privilege of self-defense" when the initial aggressor victim retreated to his truck and then into the woods, and the defendant followed the victim and killed him); *People v. Huddleston*, 530 N.E.2d 1015, 1025-26 (Ill. App. Ct. 1988) (the defendant was not entitled to claim self-defense when the victim was the initial aggressor, the defendant shot the victim in the leg, the victim tried to leave, and the defendant followed the victim to the door, hit him on the head with a gun, and shot him again); *cf. Suazo*, 867 P.2d at 169 (affirming the district court's denial of a defense of others instruction because no evidence supported "a claim that [the defendant] reasonably believed that further violence

11

towards his mother was, under any definition, imminent" when the victim, who had hit the defendant's mother, was seeking medical treatment after the "fracas that had taken place a few minutes earlier").

¶ 22    Moreover, Tatom's claim that he was right behind Sorrell as Sorrell entered his home, such that he was able to rush through the door before Sorrell could close and lock it, was flatly contradicted by the interior camera footage. That footage showed that Sorrell had walked into his home, completely shut the door, locked it, and then walked further inside the house before Tatom broke down the door. Because the video evidence indisputably contradicted Tatom's timeline, the district court could conclude that such evidence was not "credible evidence" supporting a self-defense instruction. § 18-1-407(1); *see Speer*, 255 P.3d at 1119; *Hill*, 934 P.2d at 826; *cf. People v. Liebler*, 2022 COA 21, ¶¶ 21-25 (when considering the sufficiency of the evidence for a conviction, the appellate court does not have to accept as sufficient inaccurate testimony that is indisputably contradicted by video evidence).

¶ 23    We are also not persuaded by Tatom's argument that the court "ignored evidence" that Sorrell pointed the gun at Tatom through

the window in the door "for several seconds" before Tatom entered the home.  The interior camera footage shows the door of Sorrell's home being shoved open *before* Sorrell drew the gun.  Sorrell's actions at that point — *after* Tatom started to break down his door — cannot belatedly justify Tatom's conduct as self-defense.  *See* §§ 18-1-704(1), -705; *Goedecke*, 730 P.2d at 901.

¶ 24     Even viewing the evidence in the light most favorable to Tatom, *see Newell*, ¶ 19, we cannot conclude that any credible evidence from the prosecution's case supported a self-defense instruction, *see Pearson*, ¶ 16.[2]

### III.   Prosecutorial Misconduct

¶ 25     Tatom contends that the district court plainly erred by allowing the prosecutor to commit misconduct during closing argument.  Although some of the prosecutor's remarks may have been improper, we conclude that they do not amount to reversible misconduct.

---

[2] We express no opinion on whether the district court correctly instructed the jury on self-defense at the close of all the evidence. Tatom prevailed on his ultimate request for such an instruction, the prosecution did not oppose it, and the People did not cross-appeal the issue as a matter of law.

## A.  Standard of Review

¶ 26     We engage in a two-step analysis when reviewing claims for prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.* Second, we decide whether such actions warrant reversal under the proper standard.  *Id.*

¶ 27     While prosecutors can use every legitimate means to bring about a just conviction, they have a duty to avoid using improper methods designed to obtain an unjust result.  *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005).  We evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury.  *People v. McMinn*, 2013 COA 94, ¶ 60.

¶ 28     Because Tatom did not object to the prosecutor's remarks at trial, we review for plain error.  *People v. Garner*, 2015 COA 175, ¶ 34, *aff'd*, 2019 CO 19.  For an error to be plain, it must be both obvious and substantial.  *Hagos v. People*, 2012 CO 63, ¶ 14.  "To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the

14

fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *McMinn*, ¶ 58. "Prosecutorial misconduct in closing argument rarely constitutes plain error." *People v. Smalley*, 2015 COA 140, ¶ 37.

### B. The Prosecutor's Remarks Did Not Amount to Reversible Misconduct

¶ 29 Tatom contends that the prosecutor improperly argued that he could not claim self-defense because he did not retreat or call 911. Even if the prosecutor's remarks stretched the boundary of proper argument, we conclude that the district court did not plainly err by not sua sponte correcting those remarks.

¶ 30 In Colorado, "a non-aggressor may assert self-defense without (1) considering whether a reasonable person would retreat to safety rather than resorting to physical force, or (2) actually retreating from an attack even if [they] could safely do so." *People v. Monroe*, 2020 CO 67, ¶ 19. But an initial aggressor must retreat before using force in self-defense. *Id.* Accordingly, a prosecutor may argue about a defendant's "decision to enter the fray" and whether such a decision makes him the initial aggressor. *Id.* at ¶ 28. But a prosecutor may not argue that a defendant's failure to retreat

"undermines the reasonableness" of a claim of self-defense because such an argument "would cripple the no-duty-to-retreat rule." *Id.* at ¶ 30.

¶ 31    During closing argument, while discussing the "reasonableness" of Tatom's belief that he needed to defend himself from Sorrell, the prosecutor referenced Tatom's testimony that "he did not have enough time to call 911." The prosecutor argued,

> A question was posed well, why didn't Mr. Tatom call 911? And Mr. Tatom's response was . . . I didn't have time. So, the first knock I submit to you, again less of a knock and more of a bang. And three minutes later, Mr. Tatom is coming through . . . Mr. Sorrell's door. So, three minutes and you didn't have time to call 911? Turning back to reasonableness, a person in his shoes, how would they reasonably react? I submit [to] you a reasonable person who has minutes would call 911. Especially thinking that this person has a gun, especially if he was so threatened and had minutes.

The prosecutor then argued that there were twenty seconds between when Sorrell "stepped outside" and when Tatom "bum rushed" the door, which was "[e]nough time to call 911."

¶ 32    The prosecutor also discussed comments made during voir dire regarding reasonableness and self-defense. The prosecutor

16

noted that one prospective juror had wondered why a person would put themself "in harm's way" and that another had said that "the best choice is to get away."  The prosecutor said those "statements are the statements and questions of a reasonable person."

¶ 33    Tatom contends that the prosecutor's remarks improperly encouraged the jurors to reject his self-defense theory by insinuating he should have retreated, contrary to Colorado law.  To be sure, the prosecutor did not *expressly* argue that Tatom was obligated to retreat and failed to do so.  Read in context, the prosecutor's remarks appear designed to encourage the jury to question Tatom's credibility based on his testimony that, despite evidence to the contrary, he did not have enough time to call 911.  But by arguing that a reasonable person would have believed they had enough time to call 911, the prosecutor implied that "retreat was possible but not pursued."  *Monroe*, ¶ 30.  And the prosecutor's recall of the voir dire comments also suggested that retreating was the reasonable response.  These remarks at least toed the line of impropriety, if they did not cross it.  Nevertheless, for three reasons we conclude that the error was not "flagrant or glaringly or tremendously improper" and did not "so undermine the

17

fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *McMinn*, ¶ 58.

¶ 34     First, during rebuttal closing, the prosecutor argued, "[I]t is not reasonable to believe you're inside your house behind a locked door and someone bum rushes your door, and they're going to claim self-defense.  Makes absolutely no sense.  You should find Mr. Tatom guilty because he had aggression.  He was the initial aggressor.  He started this."  The prosecutor thus reframed her argument in rebuttal and made it about Tatom's status as the initial aggressor — his decision to enter the fray — rather than focusing on the reasonableness of his decision not to retreat.  *See Monroe*, ¶ 28; *see also Domingo-Gomez*, 125 P.3d at 1052 ("Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their thoughts.").

¶ 35     Second, *Monroe* is distinguishable.  In that case, the prosecutor commented directly on the defendant's failure to retreat five times, and "each statement directed the jury to consider [the defendant's] failure to retreat as relevant to whether [the defendant] reasonably believed that [they] needed to act in self-defense."  *Monroe*, ¶ 36.  Here, the prosecutor's comments were fleeting, and

she never directly referenced "retreat." *See People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006) ("whether the misconduct was repeated" is a relevant factor to determine if reversal is warranted).

¶ 36   Third, the court correctly instructed the jury that Tatom was "legally authorized to use physical force upon another person *without first retreating*" if certain conditions were met. (Emphasis added.) *See* COLJI-Crim. H:11 (2021). We presume that the jurors followed this instruction. *People v. McKeel*, 246 P.3d 638, 641 (Colo. 2010).

¶ 37   For these reasons, and viewing the prosecutor's statements in context, *McMinn*, ¶ 60, we conclude that any prosecutorial misconduct was not plain, *Hagos*, ¶ 14.

## IV.   Merger

¶ 38   Tatom contends that his second and third degree assault convictions should merge into his burglary conviction. The People do not dispute that merger is required. We agree.

¶ 39   "Whether convictions for different offenses merge is a question of law that we review de novo." *People v. Sims*, 2020 COA 78, ¶ 37 (citing *Page v. People*, 2017 CO 88, ¶ 6). "[I]f one offense is included in another offense, a defendant may not be convicted of both

19

offenses." *Friend v. People*, 2018 CO 90, ¶ 32; *see* § 18-1-408(1), C.R.S. 2025.  An offense is a lesser included one if it "is established by proof of the same or less than all the facts required to establish the commission of the offense charged."  § 18-1-408(5)(a).

¶ 40     Here, the second and third degree assault charges are lesser included offenses of the first degree burglary charge because the burglary was predicated on the assaults.  *People v. Delci*, 109 P.3d 1035, 1037 (Colo. App. 2004) ("Because the predicate offense charged here was assault, proof of the elements of burglary requires proof of the elements of assault.  Thus, assault is a lesser included offense of first degree burglary, and the two counts merge."); *see* §§ 18-3-203(1)(i), 18-3-204(1)(a), 18-4-202(1), C.R.S. 2025.  Accordingly, we conclude that the assault convictions must merge into the burglary conviction.  *See People v. Procasky*, 2019 COA 181, ¶¶ 34, 36 ("The merger doctrine precludes conviction of both a greater and lesser included offense"; in such a case, "the lesser offense merges into the greater."); *People v. Torrez*, 2024 COA 11, ¶¶ 52-57 (noting that the lesser included offenses should have merged into one conviction and thus vacating the lesser included convictions).

20

## V.    Disposition

¶ 41    We vacate the second and third degree assault convictions and remand for the district court to merge those convictions into the burglary conviction and to correct the mittimus accordingly.  We otherwise affirm the judgment of conviction.

JUDGE DUNN and JUDGE SCHOCK concur.