The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 9, 2018

## 2018COA112

**No. 15CA1365 Peo v Jones — Criminal Law — Jury Instructions — Use of Physical Force, Including Deadly Physical Force (Intruder Into A Dwelling); Affirmative Defenses — Self-Defense — Use of Physical Force in Defense of a Person**

The defendant, charged with assaulting two occupants of a home, alleged that he had inadvertently trespassed into the home and asserted a self-defense defense. The prosecution requested an instruction pursuant to Colorado's make-my-day statute, which gives homeowners who satisfy the statutory elements the exclusive right to use force in a homeowner-trespasser encounter, thereby negating a trespasser's right to claim self-defense.

The division holds that the trial court erred in failing to instruct the jury that the make-my-day statute requires a "knowingly" unlawful entry into the home. Because the jury could have found the defendant's entry to be mistaken or accidental, it

could have further determined that the homeowners did not have the exclusive right to use force during the encounter. Under those circumstances, the jury could then have considered the defendant's self-defense defense. But the omission of the "knowingly" element effectively negated the defendant's defense. And because the evidence supported such a defense, the instructional error was not harmless.

The dissent concludes that the district court properly instructed the jury on the make-my-day statute and, in any event, any error was harmless because the defendant did not have a viable self-defense defense.

The division reverses the judgment and remands for a new trial.

COLORADO COURT OF APPEALS                                    2018COA112

Court of Appeals No. 15CA1365
City and County of Denver District Court No. 14CR1481
Honorable Elizabeth A. Starrs, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gregory Ray Jones,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE HARRIS
Terry, J., concurs
Casebolt*, J., dissents

Announced August 9, 2018

Cynthia H. Coffman, Attorney General, Elizabeth Ford Milani, Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Michael J. Sheehan, Centennial, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2017

¶ 1     Gregory Ray Jones was convicted of assault after he entered an apartment occupied by four young men and a physical altercation ensued.

¶ 2     At trial, he argued that he had mistakenly entered the apartment and had used force against the homeowners only in self-defense.  Finding there was some evidence to support Jones's theory of defense, the court gave a self-defense instruction, explaining that a person is entitled to use force to defend himself against any unlawful use of force.

¶ 3     But the court also instructed the jury that, under Colorado's "make-my-day" statute, a homeowner has the right to use any degree of physical force against a person who makes an "unlawful entry" into the home.  In other words, where the make-my-day statute applies, the homeowner's use of force is necessarily lawful and therefore a trespasser has no right to use self-defense.

¶ 4     On appeal, Jones argues that the make-my-day instruction was overly broad.  He says the trial court erred in failing to instruct the jury that only a "knowingly" unlawful entry, rather than a mistaken entry, triggers the statute.  He contends that the court's error allowed the jury to determine that even a mistaken entry gave

1

the homeowners the exclusive right to use force during the altercation which, in turn, prevented the jury from properly considering his claim of self-defense.

¶ 5    We agree and, because we conclude that the error was not harmless, we reverse Jones's conviction and remand for a new trial.

I.    Background

¶ 6    Late one night, in March 2014, Jones opened the unlocked door of an apartment located in a large, gated apartment complex. He turned on the hall light and walked into one of the bedrooms.

¶ 7    The apartment was occupied by two brothers, Daniel and Ruben Peacemaker, and the brothers' two cousins (the homeowners). Jones and the homeowners had never met each other, and the homeowners all characterized Jones's entry into the apartment as a "completely random" occurrence.

¶ 8    It turned out that Jones's cousin lived in an apartment at the complex. Sometime in the previous year, the cousin had moved to a different apartment in the same complex. According to the testimony of various witnesses, the apartment complex was laid out in a confusing way: the five buildings all looked alike, and neither the buildings nor the apartments were numbered sequentially. One

of the police officers who responded to the scene got lost looking for the homeowners' apartment. He testified that the complex was "really confusing" because the "numbers are labeled really odd," and that a person would "really have to spend a lot of time in that complex so that [he] would remember which building is which."

¶ 9    Jones had visited his cousin at the complex on multiple occasions, sometimes late at night. But on that night in March 2014, Jones had been drinking. His wife estimated that the couple started drinking at 6:00 that evening and that Jones drank about five glasses of brandy before she went to bed. When Jones woke her up at around 2:00 a.m. to tell her a joke, she thought he was drunk.

¶ 10    About an hour later, after parking his car at roughly the midpoint between his cousin's former and current apartments, Jones walked into the homeowners' apartment.

¶ 11    One of the occupants, a cousin, was sleeping on the couch. He heard Jones come in and turn on the light, but he assumed — because the person who had entered acted as though he "belonged there" and was not "somebody who was busting into the place" —

3

that it was one of the Peacemaker brothers coming home late from work.

¶ 12    Jones walked past the cousin on the couch and through the open bedroom door where Daniel Peacemaker was sleeping. According to Daniel's testimony, he woke up to find Jones on top of him, punching him repeatedly in the head.  Daniel yelled, then rolled out of bed, and both men fell to the floor, where Jones continued to punch Daniel.

¶ 13    The cousin on the couch heard Daniel yell and ran into the bedroom.  He saw that Daniel, who was bleeding, had Jones "pinn[ed] against the wall," and that the two men were punching each other.  He ran over and punched Jones "as hard as [he] could" in the face.

¶ 14    The other cousin arrived in the bedroom at almost the same time.  He started punching Jones, as many times as he could, to try to knock him down.  The fighting between Jones and the three men was "really fast, really aggressive"; there were "fists flying from everyone."

¶ 15    But within ten or fifteen seconds, the fight started to move out of the bedroom.  Jones was "shuffling" with his back to the wall,

moving toward the hallway, while he swung at the three men. One cousin described it as Jones "trying to fight his way out" of the apartment. But the homeowners "weren't letting him get out."

¶ 16     Eventually, though, Jones moved into the hallway. Daniel grabbed Jones's hoodie to try to prevent him from leaving, and Jones tripped near the front door. As he tripped, Jones dropped a knife on the floor. He then "slipped out the door."

¶ 17     Daniel's brother, Ruben, who had woken to the commotion just before Jones ran out of the apartment, chased Jones out the front door, with one of the cousins in tow. Ruben and the cousin caught up with Jones, tackled him to the ground, and detained him until police arrived a few minutes later.

¶ 18     It was not until after Jones had left the apartment that Daniel realized he had been stabbed. He sustained injuries to his ears, neck, shoulders, and arm. One cousin also sustained less serious injuries.

¶ 19     Jones was charged with burglary, attempted first degree murder, and two counts of second degree assault. The jury convicted him of one count of second degree assault and one count

of third degree assault, but acquitted him of the attempted murder and burglary charges.

## II.    Jury Instructions

¶ 20    At trial, Jones argued that he had entered the apartment by mistake.  Then, when the homeowners used force against him, he justifiably defended himself, using the knife he carried for protection.[1]

¶ 21    The court gave two instructions relevant to the issue on appeal: a self-defense instruction, requested by Jones, and an instruction pursuant to section 18-1-704.5, C.R.S. 2017, known as the "make-my-day" statute, requested by the prosecution.

¶ 22    The self-defense instruction allowed the jury to acquit Jones of the assault charges if it found that Jones had used physical force to defend himself from the use of *unlawful* physical force by the homeowners.  The make-my-day instruction, however, directed the jury that, if the statutory elements were met, the homeowners' use

---

[1] Jones's tendered theory of defense instruction read: "The defendant, Gregory Ray Jones, asserts that he did not knowingly make an unlawful entry into the apartment occupied by [the homeowners].  Mr. Jones asserts that after [going] inside the incorrect apartment, he attempted to retreat and leave the apartment."

of force against Jones was *lawful.* Thus, because self-defense applies only where the defendant confronts *unlawful* force, a finding that the make-my-day statute applied would necessarily negate Jones's defense.

¶ 23    On appeal, Jones contends that the trial court erred in instructing the jury that the make-my-day statute is triggered upon *any* unlawful entry into a dwelling, rather than upon a "knowingly" unlawful entry. The error, Jones says, meant that the jury could have concluded that the make-my-day statute applied even though Jones's unlawful entry into the homeowners' apartment was mistaken or accidental, not "knowing." As a result, he argues, the erroneous make-my-day instruction negated his otherwise valid claim of self-defense.

## A.    Standard of Review

¶ 24    A trial court has a duty to instruct the jury correctly on the applicable law. *People v. Pahl,* 169 P.3d 169, 183 (Colo. App. 2006). We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law. *People v. Lucas,* 232 P.3d 155, 162 (Colo. App. 2009).

¶ 25    We review a preserved objection to a jury instruction for harmless error. *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001). A jury instruction error is not harmless when the error permits the jury "to hold [the] defendant to a higher standard in establishing self-defense than is required by law." *People v. Ferguson*, 43 P.3d 705, 708 (Colo. App. 2001).

## B.    Affirmative Defense of Self-Defense

¶ 26    Under section 18-1-704(1), C.R.S. 2017, a person has the right to use force to defend himself from the use or imminent use of unlawful physical force by another person, and he may use a degree of force that he reasonably believes is necessary for that purpose.

¶ 27    That right is not absolute, however. As relevant here, an "initial aggressor" may use physical force to defend himself only if, after he withdraws from the encounter and effectively communicates to the other person his intent to do so, the other person nevertheless continues the use of unlawful physical force. § 18-1-704(3)(b).

¶ 28    As a general matter, though, a person's ability to defend himself — even an initial aggressor's — does not turn on whether he is where he has a right to be. *People v. Toler*, 9 P.3d 341, 352 (Colo.

8

2000). "[T]respassers do not forfeit their rights to self-defense merely by the act of trespassing." *Id.* Thus, a trespasser may use physical force to defend himself where, for example, the occupant of the property confronts him with unlawful physical force. *Id.* And even an initial aggressor may assert self-defense, irrespective of his status as a trespasser, so long as he "withdraws and communicates as required by the statute." *Id.*

¶ 29 These rules animate the principle that the touchstone of self-defense is a belief that one is defending against the *unlawful* use of force. *People v. Silva*, 987 P.2d 909, 915 (Colo. App. 1999). The corollary to that principle is that a person is not justified in using force to defend against another person's lawful use of force.

### C. The Make-My-Day Statute

¶ 30 Under the make-my-day statute, any degree of physical force by a homeowner against certain trespassers is lawful. Thus, when the make-my-day statute applies, it operates as a bar to a trespasser's claim of self-defense. *See People v. Chirico*, 2012 COA 16, ¶ 15.

¶ 31 Section 18-1-704.5(2) provides, in relevant part, as follows:

Notwithstanding the provisions of section 18-1-704 [the self-defense statute], any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

¶ 32    The make-my-day statute therefore has three elements: (1) an unlawful entry; (2) the occupant's reasonable belief that the person entering unlawfully has committed, is committing, or intends to commit a crime other than the entry; and (3) the occupant's reasonable belief that the person entering unlawfully might use physical force against an occupant. *See People v. Zukowski*, 260 P.3d 339, 343 (Colo. App. 2010). Only the first element is at issue here.

¶ 33    The "vexing question" of the proper definition of "unlawful entry" was resolved in *People v. McNeese*, 892 P.2d 304, 310 (Colo. 1995): "[A]n unlawful entry means a knowing, criminal entry into a dwelling." Though the statute does not contain the word

10

"knowingly," the supreme court construed the statute to require a "culpable mental state" because, without such a requirement, the occupant of a dwelling could lawfully use physical force, even deadly physical force, against "any unanticipated or unexpected 'intruder.'" *Id.* at 311. And surely, the court reasoned, the legislature did not intend the statute to justify the use of physical force against "persons who enter a dwelling accidentally or in good faith." *Id.* Thus, the statutory language justifies an occupant's use of physical force against another person only when the other person has made "an entry in knowing violation of the criminal law" — that is, when the other person is "knowingly engaging in criminal conduct." *Id.* at 310-11.

¶ 34    Jury Instruction Number 29 instructed the jury that any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person "has made an unlawful entry into the dwelling," and the other elements of the make-my-day statute are established. Over defense counsel's objection, the court declined to add the word "knowingly" to modify the "unlawful entry" element.

### D. *McNeese*'s Definition of "Unlawful Entry" is Not Limited to Immunity Cases

¶ 35    The People contend that the supreme court's interpretation of the term "unlawful entry" in the make-my-day statute is limited to cases in which the homeowner, not the trespasser, asserts the affirmative defense of self-defense.[2]   We are not persuaded.

¶ 36    To be sure, the make-my-day statute can apply outside the immunity context.  *See People v. Hayward*, 55 P.3d 803, 805 (Colo. App. 2002).  The question is whether the supreme court intended "unlawful entry" to have a different meaning depending on whether the homeowner or the trespasser is on trial.

---

[2] The People raised this argument for the first time at oral argument.  Though we ordinarily decline to consider arguments raised for the first time at oral argument, *see People v. Becker*, 2014 COA 36, ¶ 23, we exercised our discretion to consider the argument and ordered the parties to file supplemental briefing on the issue of whether the definition of "unlawful entry" articulated in *People v. McNeese*, 892 P.2d 304, 310 (Colo. 1995), applies to this case.  In addition to addressing the supplemental issue, Jones argued for the first time that we should review his challenge to the make-my-day instruction under a constitutional harmless error standard.  Because we conclude that Jones prevails under a harmless error standard, we decline to address his new argument.  The People also raised new, nonresponsive arguments in their supplemental briefing.  We likewise decline to consider those arguments.

12

¶ 37    We begin with the uncontroversial proposition that we are "bound to follow supreme court precedent." *In re Estate of Ramstetter*, 2016 COA 81, ¶ 40 (quoting *People v. Gladney*, 250 P.3d 762, 768 n.3 (Colo. App. 2010)). Our obligation takes on even greater import when it comes to statutory interpretation, because our departure from supreme court precedent amounts to an amendment of the statute that the legislature has not approved. *See Kimble v. Marvel Entm't*, 576 U.S. ___, ___, 135 S. Ct. 2401, 2410 (2015).

¶ 38    Nonetheless, the People urge us to abandon the definition of "unlawful entry" articulated in *McNeese*. They contend the *McNeese* court adopted the "knowing" element of the "unlawful entry" requirement to temper the statute's grant of immunity to homeowners who use what would otherwise amount to excessive force against trespassers. *See* 892 P.2d at 310-11. We agree that this concern informed the supreme court's statutory interpretation, at least in part, but the People do not explain why this concern would not be present in cases where an unwitting trespasser is prosecuted and seeks to invoke self-defense.

13

¶ 39     As the *McNeese* court observed, the make-my-day statute "is similar to self-defense," but is much broader because it justifies deadly physical force, not just physical force, against an intruder, even when the intruder threatens the slightest use of force against the homeowner. *Id.* at 309. Thus, the court construed the statute to shield the homeowner only when the intruder made a "knowing, criminal entry" into the home. *Id.* at 310. Otherwise, a homeowner could take advantage of the statute's grant of immunity to use otherwise excessive force against a person who had a good faith belief that he was making a lawful entry. At bottom, the purpose of the "knowing" element is to protect the accidental trespasser. *See id.* at 310-11. (The supreme court apparently did not consider the second and third statutory requirements sufficient to achieve that goal.)

¶ 40     Given that purpose, we do not see why the knowing element would suddenly become irrelevant simply because the trespasser, not the homeowner, is ultimately prosecuted. An accidental trespasser who is confronted by a homeowner's excessive force would be unable to lawfully use force to defend himself, giving the homeowner a "license" to use unnecessary force against any

14

intruder — the same scenario the supreme court intended to discourage in *McNeese.* *Id.* at 309; *see also id.* at 311 ("The immunity was not intended to justify use of physical force against persons who enter a dwelling accidentally or in good faith.").

¶ 41 The dissent raises a different reason to disregard *McNeese*'s definition of "unlawful entry." According to the dissent, the "knowing" element is tied not to the consequences of granting immunity, but instead to the burden of proof. In an immunity case, when the defendant homeowner raises the make-my-day defense at trial, it operates as an affirmative defense, meaning the prosecution bears the burden to disprove the defense beyond a reasonable doubt, including that the victim's entry was knowingly unlawful. *People v. Janes*, 982 P.2d 300, 303 (Colo. 1999). But in a case where the trespasser is prosecuted, the dissent says, the prosecution's task is to prove the elements of the charged offenses; it should not bear the additional burden of proving that the homeowner used lawful force against the trespasser under the make-my-day statute.

¶ 42 The issue on appeal, though, is simply whether the instruction should have included the "knowingly" element of the statute's

15

unlawful entry requirement. The dissent's argument goes to a different issue: Who should bear the burden of proof when the make-my-day statute is not raised by the homeowner as an affirmative defense?

¶ 43   Assuming the burden of proof were our concern, though, we note that the prosecution requested the make-my-day instruction in this case. It asked the jury to find that, at the moment Jones "unlawfully" entered the apartment, the homeowners were "justified in using any degree of physical force, including deadly physical force," against him. The instruction's effect — and, presumably, its purpose — was to give the homeowners the exclusive right to self-defense and thereby negate any such claim by Jones.

¶ 44   But regardless of whose burden it was to prove the application (or nonapplication) of the make-my-day statute, the jury had to be correctly instructed as to its elements. The dissent does not explain why the prosecution should be entitled to the benefit of a broader definition of "unlawful entry" simply because Jones was on trial, not the homeowners. Indeed, even if Jones should have borne the burden of proof (and we do not decide that issue, as it was not raised in the trial court or on appeal), he could not have disproved

16

the homeowner's exclusive right to use physical force unless the instruction included the disputed "knowingly" element.

¶ 45    Accordingly, we see no reason to depart from *McNeese*'s definition of "unlawful entry."

### E. The Make-My-Day Instruction Improperly Abridged Jones's Self-Defense Defense

¶ 46    Jones presented two theories of self-defense, both of which started from the premise that Jones had unlawfully, but mistakenly, entered the homeowners' apartment. Under the first theory, after the mistaken entry, Daniel was the initial aggressor, and Jones's use of physical force was justified as a reasonable response to the homeowners' unlawful use of force. Under the alternative theory, even if, after the mistaken entry, Jones was the initial aggressor, he tried to retreat by leaving the apartment, but the homeowners nevertheless used unlawful physical force to try to detain him, and therefore Jones's use of physical force after his attempt to retreat was justified as self-defense.

¶ 47    But if the make-my-day statute applied — that is, if Jones made an "unlawful entry" into the apartment (and the other statutory criteria were met) — then he would not be justified in

17

using physical force against the homeowners. That is true because, under those circumstances, the homeowners' use of physical force against Jones was necessarily lawful, and, as we have noted, self-defense is only a defense to another's use of unlawful physical force.

¶ 48    The trial court, however, declined to instruct the jury that Jones's entry was not an "unlawful entry" for purposes of the make-my-day statute unless it was made "knowingly" — meaning, with a "mental state [that] reflect[s] an entry in knowing violation of the criminal code." *McNeese*, 892 P.2d at 312. A mistaken or accidental entry is not a knowingly unlawful entry. *Id.* at 312.

¶ 49    Although it is generally true that "an instruction couched in terms of the language of the statute is proper," a trial court must tailor those instructions to the particular circumstances of the case. *Idrogo v. People*, 818 P.2d 752, 754 (Colo. 1991). Therefore, an instruction clarifying the meaning of "unlawful entry" is necessary where the evidence supports a theory that the defendant accidentally entered the dwelling or otherwise entered without the requisite mental state. *Cf. Hayward*, 55 P.3d at 805 (perceiving no error in the trial court's decision to give the make-my-day

18

instruction in the exact terms of the statute, where the evidence was undisputed that the defendant's attempted entry into his estranged wife's home was knowingly unlawful).

¶ 50    Here, in the absence of any further instructions to the jury about the meaning of "unlawful entry," the jury could have erroneously concluded that even an accidental entry into the apartment triggered application of the make-my-day statute.  A mistaken entry, after all, could still be unlawful under the criminal code, *see* § 18-4-504, C.R.S. 2017 (criminal trespass in the third degree); *see also McNeese*, 892 P.2d at 316 (Scott, J., dissenting) ("[U]nder the majority's definition [of unlawful entry], third degree criminal trespass would not fulfill the 'unlawful entry' requirement because it lacks the culpable mental state of knowingly."), even if it does not count as "knowingly" unlawful for purposes of the make-my-day statute.

¶ 51    We therefore conclude that the court erred in failing to instruct the jury that the make-my-day statute's "unlawful entry" element requires that the unlawful entry be made "knowingly."

¶ 52    We further conclude that the instructional error was not harmless.  The evidence supported Jones's theory that he entered

19

the apartment accidentally, under the mistaken belief that he was entering his cousin's apartment: Jones's cousin lived in the complex, the cousin had recently moved, the complex was difficult to navigate, and Jones was apparently drunk. Indeed, after receiving an instruction on "mistaken belief of fact,"[3] the jury acquitted Jones of first degree burglary.

¶ 53   Accordingly, the record supported a determination by the jury that Jones's entry was accidental and that the make-my-day statute did not apply.

¶ 54   Under those circumstances, the jury would then have evaluated Jones's claim of self-defense under ordinary self-defense principles. If the jury determined that Daniel was the initial aggressor, Jones was entitled to use physical force to defend himself from the moment Daniel used unlawful physical force against him. But even if the jury determined that Jones was the initial aggressor,

---

[3] The "mistaken belief of fact" instruction applied only to the burglary charge and provided, in relevant part, that "[t]he defendant's conduct was legally authorized if: (1) the defendant engaged in prohibited conduct under a mistaken belief and (2) due to this mistaken belief he did not form the particular mental state required in order to commit the offense." The requisite mental state for burglary is "knowingly."

it could nonetheless have credited Jones's theory of self-defense if it also determined that Jones had attempted to withdraw from the encounter and had effectively communicated his intent to the homeowners, but that the homeowners nevertheless continued the use of unlawful physical force against him.

¶ 55    The erroneous make-my-day instruction, though, meant that the jury might not have evaluated the claim of self-defense even though it found that Jones's entry was not "knowingly" unlawful. *See Ferguson*, 43 P.3d at 708 (An error in the self-defense instruction is not harmless where "we simply cannot determine the manner in which the jury applied the self-defense instruction, if at all.").

¶ 56    The People contend that any error was harmless because Jones's acquittal on the burglary charge rendered the make-my-day instruction "moot." According to the People, in acquitting Jones of burglary, the jury necessarily determined that Jones had not made a knowingly unlawful entry. Therefore, the jury would have known that the make-my-day instruction did not apply and would have considered Jones's self-defense defense.

¶ 57    Not true, because only the burglary instruction required a "knowingly" unlawful entry; the make-my-day instruction required only an "unlawful" entry.  Thus, the jury could have determined that Jones did not "knowingly" enter the homeowners' apartment unlawfully, for purposes of the burglary statute, because his entry was accidental or mistaken.  But it could still have concluded, for purposes of the make-my-day statute, which did not include a "knowingly" element, that Jones committed an unlawful (though accidental or mistaken) entry — i.e., a third degree trespass.  *See* § 18-4-504.

¶ 58    The likelihood that this precise problem occurred was only increased by the mistaken-belief-of-fact instruction.  The jury was told that, for purposes of the burglary charge only, if Jones engaged in prohibited conduct — presumably, entering the apartment — under a mistaken belief, and the mistaken belief precluded him from forming the requisite mens rea (knowingly), his conduct was "legally authorized."  The jury, following this instruction, could have concluded that Jones's entry into the apartment was made under a mistaken belief that he was entering his cousin's apartment and it could have acquitted Jones of burglary on that basis.  But because

the instruction applied only to the burglary charge, the jury could reasonably have understood that it could not consider the "mistaken" or "accidental" nature of the entry for any other purpose, including applicability of the make-my-day statute.

¶ 59    Nor are we persuaded by the People's alternative argument, that the error was harmless because the evidence overwhelmingly disproved Jones's claim of self-defense.

¶ 60    True, Daniel testified that he awoke to Jones jumping on top of him and "throwing blows to [his] head . . . more [times than he] could count." That testimony was sufficient to establish that Jones was the initial aggressor and not entitled to claim self-defense unless he met other criteria. But other evidence contradicted Daniel's testimony. Despite the nearly twenty punches to his head and face, on cross-examination he admitted that he did not sustain any injuries to his face, and he agreed that photographs taken just after the fight and a week later showed no facial injuries. There was also the lack of any motive. The homeowners testified that they had never met Jones and that his entry into their apartment was "completely random." A rational juror was not compelled to accept Daniel's testimony that Jones was the initial aggressor. And if

23

Jones was not the initial aggressor, and the make-my-day statute did not apply, he was entitled to use physical force against Daniel from the inception of the incident.

¶ 61 But even if Jones was the initial aggressor, he was entitled to claim self-defense if he attempted to withdraw from the encounter and effectively communicated his intent to do so but the homeowners nonetheless continued any unlawful use of physical force. *See* § 18-1-704(3)(b). Each of the four occupants testified that very quickly after the altercation started — within ten or fifteen seconds, according to one of the cousins — Jones attempted to extricate himself from the melee and leave the apartment. But each of the four occupants also testified that they continued to use physical force against Jones in an effort to detain him. Some evidence, or at least reasonable inferences drawn from it, also supported Jones's argument that he did not use the knife until after he had attempted to withdraw from the altercation and get out of the apartment.

¶ 62 The dissent says Jones's efforts to extricate himself from the altercation were merely an "attempt to flee a crime scene." The jury could have adopted that view, but we cannot say that it is the only

24

reasonable view of the evidence. *See State v. Jones*, 165 So. 3d 74, 87 (La. Ct. App. 2013) (the jury is the "ultimate fact-finder" in determining whether the defendant acted in self-defense, including whether the defendant was the initial aggressor who had withdrawn from the conflict); *see also People v. Hernandez*, 3 Cal. Rptr. 3d 586, 588 (Cal. Ct. App. 2003) (an initial aggressor may communicate withdrawal either by words or conduct; verbal notification is not required).

¶ 63    In sum, we cannot say that the evidence was so overwhelming that the instructional error was harmless. *See Garcia*, 28 P.3d at 344 (error in jury instruction is not harmless where the language of the instruction creates a reasonable probability that the jury could have been misled in reaching a verdict).

¶ 64    Finally, to the extent the People argue that defense counsel's closing argument cured the effect of an erroneous jury instruction, we reject that argument. True, in his closing argument, defense counsel told the jury that Jones's mistaken or accidental entry into the apartment did not constitute a "knowing unlawful entry," and therefore Jones could use physical force to defend himself from the homeowners' use of physical force against him. But defense

counsel's closing argument, even if a correct statement of the law, did not remove the taint of the court's error. "[A]rguments by counsel cannot substitute for instructions by the court." *Taylor v. Kentucky*, 436 U.S. 478, 488-89 (1978). It is the duty of the trial court — not counsel — to "correctly instruct the jury on all matters of law for which there is sufficient evidence to support giving instructions." *People v. Jacobson*, 2017 COA 92, ¶ 10 (quoting *People v. Carbajal*, 2014 COA 60, ¶ 10). Consistent with its obligation, the trial court repeatedly admonished the jury to "go with the instructions," reminding the jury that "if the lawyers say the law is something and it's something different in the instructions, then you go with the instructions."

¶ 65    The language of the make-my-day instruction improperly abridged Jones's claim of self-defense and created a reasonable probability that the jury could have been misled in reaching a verdict. Accordingly, we reverse Jones's convictions and remand for a new trial.

## III.    Remaining Contentions

¶ 66    Jones also contends that the trial court erred in denying his motion for a mistrial after he sought to add a dismissed juror to his

witness list and in denying his request for the juror's contact information.  In light of our disposition, we do not address these additional claims.

## IV.    Conclusion

¶ 67    The judgment of conviction is reversed, and the case is remanded to the trial court for a new trial.

JUDGE TERRY concurs.

JUDGE CASEBOLT dissents.

JUDGE CASEBOLT, dissenting.

¶ 68    For a number of reasons, I perceive no error by the trial court that prejudiced defendant's substantial rights. Therefore, I respectfully dissent.

¶ 69    At approximately 3:30 a.m., defendant opened the unlocked door of an apartment, turned on the hall light, and walked into the bedroom of Daniel Peacemaker, who woke up to find defendant on top of him. Defendant struck Daniel at least seven times in the head, face, and shoulder areas. Testimony at trial established that Daniel yelled, "Who are you?" and "What are you doing here?" The two then rolled out of the bed and fell to the floor, where defendant continued to punch Daniel approximately ten more times. Daniel testified that he did not return defendant's strikes until after the two men rolled onto the floor and defendant continued to pummel him there. Daniel then responded with his own blows.

¶ 70    Another resident of the apartment heard Daniel's yells and ran into the bedroom. He saw that Daniel was bleeding but had defendant pinned against the wall, and that the two men were punching each other. The resident joined in the altercation and

28

punched defendant multiple times. A third resident ran into the bedroom and joined the fray.

¶ 71 After ten or fifteen seconds, the fight started to move out of the bedroom. All the occupants testified that defendant appeared to be attempting to get out of the apartment while the fight continued. After additional blows and pushing occurred, defendant dropped a knife (on which Daniel's blood was found) onto the floor and slipped out the front door. Two of the apartment residents chased defendant and detained him until police arrived.

¶ 72 Meanwhile, Daniel realized he had been stabbed. He sustained injuries to his ears, neck, shoulders, and arm. Daniel's cousin, another resident, also sustained less serious injuries.

¶ 73 The prosecution charged defendant with first degree burglary as to Daniel and the cousin; attempted first degree murder of Daniel; and two counts of second degree assault, one as to Daniel and one as to the cousin.

¶ 74 Defendant did not testify at trial. His theory of the case instruction asserted that he did not knowingly make an unlawful entry into the apartment and that, after he realized he was in the incorrect apartment, he attempted to retreat and leave.

¶ 75   The jury convicted defendant of one count of second degree assault as to Daniel and one count of the lesser included offense of third degree assault (knowing) as to the cousin, but acquitted him of the attempted murder and burglary charges.

I.     Jury Instructions

¶ 76   During the jury instruction conference, defense counsel argued that there was sufficient evidence to warrant instructing the jury on self-defense.  Over the prosecutor's objection, the trial court agreed that there was at least a scintilla of evidence on the issue and instructed the jury, pursuant to the self-defense statute, section 18-1-704, C.R.S. 2017, in pertinent part, as follows:

> The defendant was legally authorized to use physical force upon another person without first retreating if:
> (1) he used that physical force in order to defend himself or a third person from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and:
> (2) he used a degree of force which he reasonably believed to be necessary for that purpose, and
> (3) he did not, with intent to cause bodily injury or death to another person, provoke the use of unlawful physical force by that other person, and
> (4) he was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn

30

> from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force.
>
> The prosecution has the burden to prove, beyond a reasonable doubt, that the defendant's conduct was not legally authorized by this defense. In order to meet this burden of proof, the prosecution must disprove, beyond a reasonable doubt, at least one of the above numbered conditions.

¶ 77 Pursuant to the prosecutor's request and over defense counsel's objection, the court also instructed the jury on the Colorado "make-my-day" statute, section 18-1-704.5(2), C.R.S. 2017. The instruction, which quoted that statute almost verbatim, stated as follows:

> Any occupant of a dwelling is justified in using any degree of physical force, including deadly physical force, against another person when that other person has made an unlawful entry into the dwelling, and when the occupant has a reasonable belief that such other person has committed a crime in the dwelling in addition to the uninvited entry, or is committing or intends to commit a crime against a person or property in addition to the uninvited entry, and when the occupant reasonably believes that such other person might use any physical force, no matter how slight, against any occupant.

¶ 78    Defense counsel objected that the instruction was extraneous and confusing, "especially when it comes to [defendant's] right to defend himself when he is attempting to retreat to the wall" and that "even if [defendant] was the initial aggressor he is still allowed to use force to defend himself when he is effectively communicating to these people his intent to retreat to the wall." Counsel also stated that, "I don't feel that it's necessary or relevant to advise the jury on what the rights of these four occupants of the apartment are, because they are not on trial." Defense counsel further argued that, if the court was going to give the instruction, it should insert the word "knowing" before the word "unlawful," such that an intruder entering the dwelling had to have made a knowing unlawful entry before the occupants could use physical force. Counsel asserted:

> [T]he point I'm trying to make is that a person may have known that they were walking through a door, but they may not have believed that it was unlawful. So I think it's important to make that distinction in there because without it, all it was is knowingly walked through a door, when really, the crux of the argument when it comes to burglary is whether [defendant] knew he was breaking the law when he walked through the door.

32

¶ 79    Over the prosecutor's objection, the court also determined that

it would instruct the jury on mistake of fact as an affirmative

defense.  The court found that there was at least a scintilla of

evidence that defendant was intoxicated on the night of the

occurrence, that his cousin lived in the apartment complex and

defendant had visited him there previously, and that the complex

was extremely confusing in its configuration and numbering.

Accordingly, it instructed the jury, in pertinent part, that

> [t]he evidence in this case has raised the
> affirmative defense of "mistaken belief of fact"
> as a defense to First Degree Burglary.  The
> defendant's conduct was legally authorized if:
> (1) the defendant engaged in prohibited
> conduct under a mistaken belief and
> (2) due to this mistaken belief he did not form
> the particular mental state required in order to
> commit the offense.

¶ 80    Without objection, the court also instructed the jury on second

degree assault on Daniel and third degree assault (knowing) on the

cousin.  Those instructions provided, again as pertinent here, as

follows:

> The elements of the crime of Second Degree
> Assault [Daniel] are:
> (1) that the defendant
> . . .

33

(3) with intent to cause bodily injury to another person
(4) caused such injury to any person, namely: [Daniel]
(5) by means of a deadly weapon, namely: knife [and]
(6) that the defendant's conduct was not legally authorized by the affirmative defense [of self-defense].

The elements of the crime of Assault in the Third Degree- (Knowing) [the cousin] are:
(1) that the defendant
. . .
(3) knowingly . . .
(4) caused bodily injury to another person, namely: [the cousin], and
(5) that the defendant's conduct was not legally authorized by the affirmative defense [of self-defense].

## II.    Self-Defense and Make-My-Day Instruction

¶ 81    Unlike the majority, I do not perceive that the trial court erred in giving the make-my-day instruction without inserting the modifier "knowing" as requested by defendant.

### A.    Standard of Review

¶ 82    The trial court has a duty to instruct the jury on all matters of law. *People v. Gallegos*, 226 P.3d 1112, 1115 (Colo. App. 2009). "The district court has substantial discretion in formulating the jury

34

instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented." *Id.*

¶ 83     We review de novo whether a particular jury instruction correctly states the law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). We review a trial court's decision to give a particular jury instruction for an abuse of discretion. *Id.* We also review the question whether the trial court erred when it denied a defendant's request for a particular instruction for an abuse of discretion. *See People v. Marks*, 2015 COA 173, ¶ 53. A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair. *Id.* A court may also abuse its discretion if its decision is based on an erroneous understanding or application of the law. *People v. Ortiz*, 2016 COA 58, ¶ 14.

¶ 84     A trial court should not instruct a jury on abstract principles of law unrelated to the issues in controversy. *People v. Silva*, 987 P.2d 909, 913 (Colo. App. 1999). "Although it is appropriate for the jury to resolve questions of fact, the court has the duty to determine first which issues have been raised by the evidence presented." *Id.* at 915.

35

## B. Applicability of *People v. McNeese*

¶ 85    The majority relies on *People v. McNeese*, 892 P.2d 304, 310 (Colo. 1995), for the proposition that the phrase "unlawful entry" in section 18-1-704.5(2) must be construed to mean a "knowing" criminal entry into a dwelling, and the jury must be so instructed. While that construction of the statute makes sense when an occupant of a dwelling seeks immunity from prosecution for (or as an affirmative defense justifying) the employment of physical or deadly force against an intruder, the same cannot be said when the defendant is the intruder, as here, and seeks to justify his use of physical force against the occupant of a dwelling. An examination of the factual circumstances and rationale of *McNeese* reveals why.

¶ 86    In *McNeese,* the defendant was the occupant of a dwelling who was bound over for trial on attempted first degree murder and first degree assault charges arising out of the stabbing of Vivian Daniels, his roommate, and two counts of second degree murder as to victims John Daniels, the roommate's estranged husband, and David Wessels. The defendant pleaded not guilty and filed a motion to dismiss, asserting that he was immune from prosecution under the make-my-day statute. *Id.* The trial court granted his motion as

36

to the second degree murder charge for the stabbing death of John Daniels, but denied the motion as to the remaining charges. *Id.* The prosecution appealed the grant of immunity and a division of this court affirmed. *See People v. McNeese*, 865 P.2d 881 (Colo. App. 1993).

¶ 87 The supreme court reversed, concluding that the General Assembly did not intend that the occupant of a dwelling be granted immunity from prosecution for a suspected unlawful entry by an intruder. *McNeese*, 892 P.2d at 308. "[Because] the occupant of a dwelling is granted immunity from criminal prosecution for homicide . . . safeguards must be imposed. Because the statute readily grants immunity for the taking of a life, the 'knowingly' mens rea is required to carry out the principles of self-defense." *Id.* at 309. Thus, the court ultimately concluded that the defendant occupant of a dwelling who seeks immunity from prosecution for his or her use of physical or deadly force against an intruder "must prove" that there was a *knowing* criminal entry. *Id.* at 310-13.

¶ 88 Hence, the court's imposition of the "knowing" requirement is based on there being charges brought against an occupant of a dwelling, who then has the burden to prove, by a preponderance of

the evidence, that the intruder entered in knowing violation of the criminal law to obtain immunity. *Id.* at 308-09; *see People v. Zukowski*, 260 P.3d 339, 344 (Colo. App. 2010) (under *McNeese*, an intruder must knowingly engage in criminal conduct).

¶ 89 The factual circumstances of *McNeese* and the focus of the court's attention were on the burden of proof to be imposed on the occupant, who was charged with killing an intruder, to prove the intruder's state of mind on entry.

¶ 90 Here, of course, defendant was not the occupant of a dwelling facing a criminal charge because he employed force against an intruder. Instead, he was a trespassing intruder, at least as that term is defined under third degree criminal trespass, *see* § 18-4-504, C.R.S. 2017 (defining the crime as unlawfully entering or remaining in or on premises of another). This trespass offense does not contain a "knowing" element or any other specific mens rea. *See also* § 18-4-201(3), C.R.S. 2017 ("A person 'enters unlawfully' or 'remains unlawfully' in or upon premises when the person is not licensed, invited, or otherwise privileged to do so.").

¶ 91 Under such circumstances, I do not perceive that the *McNeese* rationale for imposing the "knowing" requirement for unlawful entry

38

in the make-my-day statute is applicable here. *See People v. Janes*, 982 P.2d 300, 302 (Colo. 1999) (stating that the *McNeese* court's imposition of a condition requiring a homeowner defendant to prove by a preponderance of the evidence that the victim "knowingly made an unlawful entry" was interpreting the "unlawful entry" language "in [the] context of a defendant's motion for pretrial statutory immunity").

¶ 92     Furthermore, imposing a "knowing" requirement here would, contrary to *McNeese*'s imposition of the burden of proof on the *occupant* to show by a preponderance of the evidence that the intruder entered in knowing violation of the criminal law, impose on the *prosecution* the burden to prove beyond a reasonable doubt that the intruder entered knowingly, which essentially would turn the *McNeese* rationale on its head.

¶ 93     Thus, the trial court's refusal to include the "knowing" element was, in my view, correct.

### C.    Propriety of the Make-My-Day Instruction

¶ 94     If, as I believe, *McNeese* does not apply here, the question is simply whether, as given, the make-my-day instruction was proper.

In my view it was, as an examination of *People v. Hayward*, 55 P.3d 803 (Colo. App. 2002), reveals.

¶ 95    In *Hayward*, the defendant was charged with second degree assault on his estranged wife.  The victim testified that she answered the door of her residence and encountered the defendant, who then forced his way into the residence and repeatedly stabbed her with a knife.  In contrast, the defendant testified that the victim answered the door brandishing a knife, and she sustained accidental injuries during a struggle for control of the knife.  The defendant admitted he was aware of the restraining order that prohibited him from being at the victim's residence.  *Id.* at 804.

¶ 96    At trial, the defendant requested and received an instruction on self-defense couched in the language of section 18-1-704.  The prosecution sought to limit the applicability of self-defense by explaining the victim's right to use force in her home under the make-my-day statute.  *Id.* at 805.  Over the defendant's objection, the trial court instructed the jury concerning the victim's right to defend herself in her dwelling and gave an instruction essentially identical to the make-my-day statute.  *Id.* at 805.

¶ 97    On appeal, the *Hayward* division perceived no error in the trial court's giving of the make-my-day instruction, noting that it tracked the statute verbatim and provided an explanation of appropriate legal principles at issue in the case.  *Id.*; *see People v. Gilbert*, 12 P.3d 331, 340 (Colo. App. 2000) (the trial court may instruct the jury concerning a principle of law that is related to an issue in controversy); *People v. Burke*, 937 P.2d 886 (Colo. App. 1996) (jury instructions framed in the language of statutes are generally adequate and proper).

¶ 98    The *Hayward* division then noted that, whether the defendant was legally entitled to employ force in self-defense and further to obtain an instruction at trial concerning it were dependent on whether he made an unlawful entry into the dwelling.  Because those facts were in dispute, the instruction there was properly given.  *Hayward*, 55 P.3d at 805-06.

¶ 99    Here, the instruction was proper because (1) there was a factual dispute over whether defendant unlawfully entered the apartment; (2) defendant sought and received a general self-defense instruction; and (3) the make-my-day instruction explained that the victims and other occupants were entitled to employ force against

41

defendant because he was an intruder into their apartment and it explained a legal proposition that was raised in the case. *See id.* at 805.

¶ 100 The make-my-day instruction did not, contrary to defendant's further contention, unduly limit his right to assert and argue self-defense.

¶ 101 The court's instructions concerning second and third degree assault, recited above, noted that the prosecution had to prove, beyond a reasonable doubt, that defendant's conduct was not legally authorized by the affirmative defense of self-defense. In addition, defense counsel specifically argued in closing that "the only reasonable, the only plausible explanation for what happened here is that [defendant] mistakenly walked into the wrong apartment; and that what happened in the aftermath, it was necessary for him to defend himself against what he believed to be the threat of serious bodily injury."

¶ 102 Counsel also argued that Daniel was the initial aggressor in the altercation, but, even if he was not, the evidence only proved defendant committed third degree assault as to Daniel and that no resident of the apartment testified that he saw defendant with a

knife until other people joined the altercation and defendant, being outnumbered, then employed it to defend himself. Finally, with regard to the make-my-day instruction, defense counsel stated:

> One thing you cannot lose sight of within the context of this instruction that talks about occupants of a dwelling being able to use force against a person that makes unlawful entries . . . [t]hat law does not prevent Mr. Jones from using reasonable force himself if he makes a mistaken entry into that apartment. If his entry into the apartment is a mistake, it is not a knowing unlawful entry into the apartment; and he maintains the right to defend himself in a situation like that.

¶ 103   Thus, defendant argued that he was entitled to use self-defense against the occupants and that he had to have acted knowing he had violated the criminal law in making an entry into the apartment.

¶ 104   Furthermore, the prosecutor did not argue, either in his initial or in his rebuttal closing argument, that defendant did not need to know that his conduct was criminal or that his unlawful entry into the apartment did not have to be performed "knowingly." The prosecutor asserted that the occupants had a right to use force against defendant under the make-my-day instruction, but did not argue the instruction's language omitting the word "knowing."

¶ 105    The majority perceives that the make-my-day instruction without the "knowing" element somehow limited defendant's right to self-defense.  It notes that, when the make-my-day statute applies, "it operates as a bar to a trespasser's claim of self-defense" because the occupant's use of physical force is lawful, not unlawful.  *Supra* ¶ 30; *see People v. Chirico*, 2102 COA 16, ¶15; *Silva*, 987 P.2d at 915 (a reasonable belief that one is defending against the use of unlawful force is the touchstone of self-defense).

¶ 106    But even acknowledging that this legal proposition is correct, the jury was not instructed about it.  It was not instructed that if it found defendant had entered unlawfully, he then lost the right of self-defense or that he was not justified in using force to defend against the occupants' physical force.  Certainly, the make-my-day instruction contained no such limitation.  It omitted the language "[n]otwithstanding the provisions of section 18-1-704" which would have instructed the jury that self-defense was not available if the provisions of the make-my-day statute were proved.  As given, the make-my-day instruction merely explained the occupants' right to employ physical force against a person who had unlawfully entered their apartment.  Furthermore, the prosecutor did not argue that

defendant lost his right of self-defense if the elements of the make-my-day statute were proved.

¶ 107   Nor did the make-my-day instruction defeat or limit defendant's theory of the case.  He contended, and argued to the jury, that he accidentally entered the apartment and either: (1) Daniel was the initial aggressor and his use of force was justified as a reasonable response to that aggression; or (2), even if defendant was the initial aggressor, he tried to retreat by leaving the apartment, but the occupants used unlawful physical force to try to detain him, and, thus, his use of force after his attempt to retreat was justified as self-defense.

¶ 108   In addition, the jury was specifically instructed, concerning second and third degree assault, that it had to find that defendant either acted with intent to cause bodily injury (second degree assault) or knowingly caused bodily injury (third degree assault), and that even if he did, that it had to decide whether his assault was legally authorized by the affirmative defense of self-defense.

¶ 109   Thus, considering the jury instructions as a whole, as we must, *see Day,* 255 P.3d at 1067 (courts must examine whether the

instructions as a whole accurately informed the jury of the governing law), I perceive no reversible error here.

¶ 110 The essence of the majority's position is that defendant was deprived of his full right to assert self-defense because the make-my-day instruction did not contain the "knowingly" modifier required in *McNeese*. But it cannot have been wrong to instruct the jury without the "knowing" modifier when it is clear that a possessor of property has the privilege to use physical force against an intruder even when the intruder does not enter in knowing violation of the criminal law. *See* § 18-1-705, C.R.S. 2017 ("A person in possession or control of any . . . premises . . . is justified in using reasonable and appropriate physical force upon another person when and to the extent that it is reasonably necessary to prevent or terminate what *he reasonably believes to be* the commission or attempted commission of an unlawful trespass by the other person.") (emphasis added).

D.    Harmless Error

¶ 111 Even if an instruction is given in error, reversal is not required if the error can be deemed harmless. *People v. Manzanares*, 942 P.2d 1235, 1241 (Colo. App. 1996). Reversal is warranted only if

46

the error affected the defendant's substantial rights; that is, there must be "a reasonable probability that it contributed to the defendant's conviction." *Mata-Medina v. People*, 71 P.3d 973, 980 (Colo. 2003). Stated differently, there must be a reasonable probability that the jury may have been misled in reaching a verdict. *People v. Serra*, 2015 COA 130, ¶ 56. In determining whether that is so, we review the entire record of the trial, *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989), which includes the jury instructions, the evidence presented, and arguments of counsel. *People v. Welsh*, 58 P.3d 1065, 1072-73 (Colo. App. 2002), *aff'd*, 80 P.3d 296 (Colo. 2003).

¶ 112 In my view, any error was harmless for a number of reasons:

- The jury instructions (1) did not instruct that defendant lost the right to or could not assert self-defense if the make-my-day statute applied; (2) allowed defendant to assert self-defense and be acquitted if the jury determined that Daniel was the initial aggressor; and (3) allowed defendant to assert self-defense and be acquitted even if he was the initial aggressor if the jury found that

he attempted to retreat and effectively communicated that attempt to the occupants.

- The mistake of fact instruction, while limited by its own terms to first degree burglary (a limitation defendant does not contest on appeal), did not preclude defendant from arguing that he lacked either the intent to cause injury (for second degree assault) or did not act knowingly in inflicting bodily injury (for third degree assault); thus, the jurors could not have understood that they were precluded from considering the mistaken or accidental entry theory.  Defendant in fact made that argument to the jury.

- The evidence overwhelmingly disproved defendant's theory of self-defense for the following reasons:

  o Defendant did not testify, but Daniel testified that he awoke to find defendant straddling him on the bed; defendant struck him approximately seven times; the pair then rolled to the floor and defendant struck him about ten additional times, but Daniel did not strike back until after receiving those blows on the floor; and

Daniel had not done anything to defendant before he was struck. Thus, defendant was clearly the initial aggressor. Further, even if defendant conclusively proved he mistakenly entered the apartment, the evidence that he committed assault on Daniel with a knife is unrebutted.

o Defendant improperly used force as he attempted to withdraw from the fight. *See People v. Toler*, 9 P.3d 341, 350 (Colo. 2000) (initial aggressors must retreat *before* employing physical force in self-defense).

o Defendant did not effectively communicate any intent to withdraw from the encounter; in fact, defendant said nothing at all to the apartment occupants, and his attempts to get away could not reasonably be construed as an effective communication of intent to withdraw as opposed to an attempt to flee a crime scene.

o Defendant used more force than was reasonably necessary by employing a knife, given that the occupants did not use any kind of weapon in the fight,

even though weapons were readily available in the apartment.

¶ 113 Accordingly, the jury was not misled by the make-my-day instruction, nor was there a reasonable probability that the instruction contributed to defendant's convictions for second and third degree assault.  Therefore, I respectfully dissent.